1             UNITED STATES DISTRICT COURT
                      FOR THE
2              DISTRICT OF VERMONT

3

4    United States of America      )
                                   )
5                                  )
     v.                            ) Case No. 5:22-cr-18-3
6                                  )
                                   )
7    Dominique Troupe              )
                                   )
8    _____)

9

10   RE:  Day 5 of Jury Trial

11   DATE:  May 3, 2024

12   LOCATION:  Rutland, Vermont

13   BEFORE:  Honorable Geoffrey W. Crawford
                  Chief District Judge

14

15   **APPEARANCES**:

16   Michael P. Drescher, AUSA
     Jason M. Turner, AUSA
17   United States Attorney's Office
     District of Vermont
18   PO Box 570
     Burlington, VT 05402-0570

19

20   Chandler W. Matson, Esq.
     Barr Law Group, PLC
21   125 Mountain Road
     Stowe, VT 05672

22

23

24        TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                United States District Court Reporter
25                    *verbatim@vermontel.net*

26

1 <u>INDEX OF EXAMINATION</u>

2 <u>Witness</u>          <u>Examined By</u>          <u>Page</u>          <u>Line</u>

3 Sheila Dragon      Atty. Drescher      1054          18
                    Atty. Matson        1077           6
4                   Atty. Drescher      1100          16

5 William Cleary     Atty. Turner        1101           9
                    Atty. Matson        1107           5
6                   Atty. Turner        1109          18

7 Eric Edson         Atty. Turner        1111          12
                    Atty. Matson        1124          13

8 Elizabeth Bundock, MD, PhD

9                    Atty. Turner        1140          12

10

11 <u>INDEX OF EXHIBITS</u>

12                                                                <u>Page</u>

13 <u>Government Exhibits</u>

14 90A - Dr. Bundock - EO Autopsy Photo Bates 00003810     1144

15 90B - Dr. Bundock - EO Autopsy Photo Bates 00003812     1144

16 90C - Dr. Bundock - EO Autopsy Photo Bates 00003814     1144

17 90D - Dr. Bundock - EO Autopsy Photo Bates 00003837     1144

18 90E - Dr. Bundock - EO Autopsy Photo Bates 00003841     1144

19 90F - Dr. Bundock - EO Autopsy Photo Bates 00003872     1151

20 145 - Powderhorn Records                                1103

21 145A - Troupe ATF Form 4473                             1103

22

23

24

25                 *   *   *   *   *

1    (The Court opened at 9:00 a.m.)

2    COURTROOM DEPUTY:  Your Honor, the matter before the

3    Court is Case Number 22-cr-18, Defendant Number 3, United

4    States of America versus Dominique Troupe.  Present on behalf

5    of the government are Assistant United States Attorneys Jason

6    Turner and Michael Drescher.  Present with the defendant is

7    Attorney Chandler Matson.  We are here for day five of a jury

8    trial.

9    THE COURT:  All right.  Good morning.

10   ATTORNEY MATSON:  Good morning.

11   ATTORNEY DRESCHER:  Before we bring the jury in, just

12   a quick logistical request, Your Honor.  Our first witness is

13   going to be Sheila Dragon.

14   THE COURT:  Right.

15   ATTORNEY DRESCHER:  She's here in the -- she's

16   sitting outside the courtroom in the presence of Vermont State

17   Police, to whom she surrendered herself this morning.

18   THE COURT:  Right.

19   ATTORNEY DRESCHER:  At the end of her testimony, she

20   will have discharged her obligations, and there will be no

21   reason for the warrant that Your Honor issued yesterday to

22   remain in effect.

23   THE COURT:  Right.

24   ATTORNEY DRESCHER:  To signal that without -- I

25   request that, when she's done, if you would just simply say

 1    something to the effect of, you know, You are free to go --

 2              THE COURT:  Right.

 3              ATTORNEY DRESCHER:  -- such that there's a record of

 4    her no longer being subject to that warrant.  I discussed this

 5    with Deputy Marshal Staley earlier today, and, if Your Honor

 6    were willing to do that, it would logistically make things

 7    simpler for the Marshals Service and law enforcement.

 8              THE COURT:  Yeah, all right.  Why don't we bring her

 9    in now and with Ms. Ready.  I've assigned an attorney to her.

10    So if they can come in --

11              ATTORNEY DRESCHER:  Okay.

12              ATTORNEY READY:  Good morning, Your Honor.

13              THE COURT:  Good morning, Ms. Ready.  Thank you for

14    coming in on short notice.  Very grateful.

15              ATTORNEY READY:  No problem.

16              THE COURT:  Ms. Dragon, why don't you come on up to

17    the jury box, the witness box.  We'll get you sworn in in a

18    second.  Ms. Ready, can we just explain what we're planning to

19    do, make sure it works for you?  Which is we'll start this

20    morning with Ms. Dragon's testimony.  Once she's done, I'll

21    indicate that she's free to leave, free to go, and I'll take

22    steps to, to discharge the arrest warrant, and she'll have

23    completed her obligation to the court.  Does that work from

24    your perspective?

25              ATTORNEY READY:  It does, Your Honor.  Thank you.

1    THE COURT:  Okay, all right.  So we can bring the

2  jury in.  Then we'll get the Witness sworn.  I'll appoint you,

3  Ms. Ready, at this point to represent the Witness, and, if you

4  can follow up with a financial affidavit, I'm sure it will be

5  fine, okay?  Great.

6    ATTORNEY READY:  I'd like to just sit in front.

7    THE COURT:  Right there is perfect.

8    (The Jury enters the courtroom.)

9    THE COURT:  All right.  The government's next

10  witness?

11    ATTORNEY DRESCHER:  Thank you, Your Honor.  Our next

12  witness is Sheila Dragon.

13    THE COURT:  All right.  Mr. Howe, if we could swear

14  her in.

15           SHEILA DRAGON,

16    having been duly sworn to tell the truth,

17        testifies as follows:

18       DIRECT EXAMINATION BY ATTORNEY DRESCHER

19  Q.  Good morning, Ms. Dragon.  Good morning.

20  A.  Good morning.

21  Q.  Ma'am, how old are you?

22  A.  27.

23  Q.  Where are you from?

24  A.  Sheldon.

25  Q.  Where is Sheldon compared to Swanton?

1   A.   About 15 minutes.

2   Q.   I'm sorry?

3   A.   15-minute drive.

4   Q.   Are you familiar with the Village of Swanton?

5   A.   Yes.

6   Q.   I'll take a half a step back.  Are you testifying here

7   today voluntarily?

8   A.   Yes.

9   Q.   Did you have a choice to be here?

10  A.   No, so I guess not.

11  Q.   Do you want to be here?

12  A.   No.

13  Q.   Would you be here if you had not received a subpoena to

14  testify?

15  A.   No.

16  Q.   This morning, you entered into an agreement with the

17  United States; is that correct?

18  A.   Yes.

19  Q.   And, pursuant to that agreement, you've agreed to answer

20  questions truthfully and completely this morning; is that

21  correct?

22  A.   Yes.

23  Q.   And, pursuant to that agreement, the United States has

24  agreed not to use -- I should say my office -- the United

25  States Attorney's Office has agreed not to use the information

1    you provide this morning directly or indirectly against you; is

2    that your understanding?

3    A.    Yeah.

4    Q.    How close is Swanton to the Canadian border?

5    A.    I don't know, five minutes.

6    Q.    Five minutes?  Do you have children?

7    A.    Yes.

8    Q.    How many?

9    A.    Three.

10   Q.    Who is the father of your youngest child?

11   A.    Eric Raymond.

12   Q.    And how old is your youngest?

13   A.    One.

14   Q.    In 2021, what sort of relationship were you in with Eric

15   Raymond?

16   A.    We dated for a few months.

17   Q.    Can you -- you dated what?

18   A.    For a couple of months.

19   Q.    For a couple months?  And about when did that relationship

20   start?

21   A.    October of '21, '22.

22   Q.    At that time, where did he live?

23   A.    In Swanton.

24   Q.    Do you remember where in Swanton?

25   A.    At Misti's house.

```
 1    Q.    Was that on River Street?
 2    A.    Yes.
 3    Q.    Where did you live?
 4    A.    In Sheldon.
 5    Q.    When you were seeing Eric Raymond, did you use drugs with
 6    him?
 7    A.    Yes.
 8    Q.    What drugs did you use?
 9    A.    Cocaine.
10    Q.    Any particular form of cocaine?
11    A.    Crack.
12    Q.    What was the nature of your habit?  How frequently did you
13    use when you were dating Eric?
14    A.    Daily.
15    Q.    I'm sorry.
16    A.    Daily.
17    Q.    I'm having a hard time hearing you.  I'm sorry.  It's my
18    old ears.
19    A.    Daily.
20    Q.    Daily?  Thank you.  And where did you get the crack that
21    you were using?
22    A.    Eric.
23    Q.    Do you know if Eric had any sources of income in 2021 when
24    you were seeing him?
25    A.    No.
```

1   Q.   Do you know if he was selling crack cocaine at that time?

2   A.   Yes.

3   Q.   Do you know if he had any partners in his cocaine sales?

4   A.   Yes.

5   Q.   Who was his partner?

6   A.   Misti.

7   Q.   Did you ever hear Eric refer to his and Misti's source of

8   supply by name?

9   A.   Yeah.

10   Q.   What name?

11   A.   Wop.

12   Q.   I'm sorry.  I'm just having a hard time.  What was the

13   name?

14   A.   Wop.

15   Q.   Back in late; 21, early '22, did you know where Wop lived

16   or what city or town?

17   A.   No, not directly.

18   Q.   I'm just having a really hard time understanding.

19   A.   I don't remember what town.

20           THE COURT:  If you could move the mic a little away

21   from you, yeah, a little back, I think that will -- let's try

22   that.  It's pretty sensitive, so it should pick you up.

23           ATTORNEY DRESCHER:  Thank you, Your Honor.

24   BY ATTORNEY DRESCHER:

25   Q.   Ms. Dragon, do you remember -- this is not the first time

1   we've seen each other; is that fair?

2   A.   Yeah.

3   Q.   We've met on a maybe three or four occasions; does that

4   sound about right?

5   A.   Yes.

6   Q.   And do you remember back in September of 2022 that you

7   testified in the grand jury?

8   A.   Yeah.

9   Q.   And you came to the courthouse in Burlington, and you came

10  to the grand jury and were put under oath?

11  A.   Yes, I remember that.  I just don't remember the answer to

12  your question.

13  Q.   That's okay.  That's totally okay.  I want to show you

14  what's marked as Government Exhibit 107.  Ma'am, is that a

15  transcript of your grand jury testimony?

16       (Government Exhibit 107 was shown to the Witness.)

17  A.   Yes.

18  Q.   Can you please turn to Page 9?  And I want to refer your

19  attention to Line 2 where I asked you, "Do you know where Wop

20  lived when you were in a relationship with Eric Raymond?"  And

21  you answered, "He had, has an apartment in Colchester".  Do you

22  see that?

23  A.   Yeah.

24  Q.   And today, as you sit here, do you now remember that's

25  where Wop lived?

1    A.    Yeah.

2    Q.    You can, you can put the exhibit aside for now.  Do you

3    remember ever traveling to Wop's residence in Colchester?

4    A.    Once.

5    Q.    And who did you travel there with?

6    A.    Eric.

7    Q.    And, when you got there, what did you do?

8    A.    Sat in the car.

9    Q.    You sat in the car?

10    A.    Um-hum.

11    Q.    What did Eric do?

12    A.    Went inside.

13    Q.    I'm sorry.  What did --

14    A.    He went inside.

15    Q.    Thank you.  How long were you in the car before Eric came

16    back outside?

17    A.    45 minutes, an hour.

18            THE COURT:  What's that?  I couldn't hear that.

19            THE WITNESS:  I said 45 minutes, an hour.

20    BY ATTORNEY DRESCHER:

21    Q.    Do you know what the purpose of that visit to Colchester

22    was?

23    A.    Getting drugs, probably.

24    Q.    Can you please say that again?

25    A.    So Eric could get drugs.

1    Q.   Did there come a time when you heard Eric complaining

2    about a crack-selling competitor moving into 45 First Street in

3    Swanton?

4    A.   Yes.

5    Q.   What do you remember about that?

6    A.   He was upset with his sister for buying off the kid down

7    the road.

8    Q.   He was upset with his sister?  Do you know his sister's

9    name?

10   A.   Amber Raymond.

11   Q.   And did you ever hear about a plan to do something about

12   that competitor?

13   A.   Yes.

14   Q.   Tell the jury what you heard about the plan.

15   A.   They just were going to, like, kick the kid out of the

16   house, that was that, but not to this extent.

17   Q.   But not what?

18   A.   To this extent of what happened.

19   Q.   And, when you say "what happened", what are you referring

20   to?

21   A.   The murder.

22   Q.   Was there a time when Eric and Jesse Sweet were at your

23   house talking about the plan?

24   A.   Yes.

25   Q.   And what was the nature of the conversation on that

1    occasion?

2    A.   It was Jesse's house that the guy was at, and Jesse didn't

3    want him there anymore.  So Jesse came over to my house to get

4    Eric, and I wouldn't let Eric go with him.

5    Q.   Why not?

6    A.   Because it was a bad idea.

7    Q.   And, eventually, you heard about what happened when it

8    happened; is that right?

9    A.   Yes.

10   Q.   How much time did this conversation between you and Jesse

11   and Eric happen before the actual shooting event?

12   A.   A week.

13   Q.   You eventually learned about what happened, you learned

14   about the shooting, right?

15   A.   Yes.

16   Q.   How did you learn about it?

17   A.   The news.

18   Q.   When you heard about it, what was your reaction?

19   A.   I was just kind of concerned, and I don't know.  I was

20   just in shock, I guess.

21   Q.   What were you concerned about?

22   A.   Just the well-being of these people, the well-being of

23   everyone.

24   Q.   To include who?

25   A.   Um, like, Eric, Jesse, Misti, the kid, the other kid that

1    was in the house.

2    Q.   The day after the shooting, did you and Eric go visit with

3    Eric's sister, Amber?

4    A.   Yes.

5    Q.   And am I right that Amber lived at that time in the

6    Westview Condominiums in St. Albans?

7    A.   Yes.

8    Q.   Was anybody else there other than you and Amber and Eric?

9    A.   Yeah.

10    Q.   Who else?

11    A.   I believe Amber's boyfriend, Dan.

12    Q.   Amber's boyfriend?

13    A.   Yeah.

14    Q.   While you were there, did Amber and Eric go into a

15    separate room to have a private conversation?

16    A.   Yes.

17    Q.   And were you part of that conversation when they went into

18    that separate room?

19    A.   No.

20    Q.   After that visit at Amber's house but before Eric was

21    arrested, did Eric tell you more about what happened at 45

22    First Street?

23    A.   Yeah.

24    Q.   Where were you when he told you about what happened?

25    A.   We were in a car.

1  Q.   And where were you going from and to?

2  A.   From my house to Misti's.

3  Q.   And tell the jury about that conversation.  What were you

4  talking about, and how did it come up?

5  A.   My dad had showed up at my house, and he didn't want Eric

6  there because there was, it was all over the news, and Eric had

7  gotten really upset.  So I had left with him, and he asked why

8  my dad would think that of him, whatever.  I said because I

9  figured something bad had happened.  You know, we all seen it

10  on the news.  And he said that everything went wrong, pretty

11  much, and that he didn't want that to happen and he did shoot a

12  gun, but he didn't kill him.

13  Q.   That last part I didn't get.

14  A.   That he didn't kill him, that's what he told me.

15  Q.   What, if anything, did Eric tell you about whether he shot

16  a gun?

17  A.   Yes.  He said he was scared and shot back.

18  Q.   What, if anything, did Eric tell you about whether Eric

19  thought the shot he fired actually killed the person?

20  A.   He told me that he didn't.

21  Q.   He told you what?

22  A.   He told me that he didn't believe that he did.

23  Q.   I apologize.  I'm just having a really hard time.  Can you

24  please speak closer to the microphone?

25  A.   He told me that he didn't believe he did it.

1    Q.    What was your relationship like with Misti Morin?

2    A.    After Eric went to jail, we became friends for a little

3    bit.  We used together until I got clean.

4    Q.    Until when?

5    A.    I got clean.

6    Q.    And what prompted you to get clean?

7    A.    I was pregnant.

8    Q.    Did you eventually hear from somebody that Wop may have

9    had something to do with the shooting?

10   A.    Yes.

11   Q.    Do you remember who you heard that from?

12   A.    Amber and Misti.

13   Q.    And did you share that information with Misti?

14   A.    No.  Misti, I had brought it -- yeah, I brought it to

15   Misti saying that, what Amber had told me.

16   Q.    Can you please speak closer to the microphone?

17   A.    Yes.  I had told Misti that what Amber had told me.

18   Q.    You told Misti that you had heard that Wop was involved?

19   A.    Yes.

20   Q.    How did Misti react?

21   A.    And somebody else.

22   Q.    I'm sorry.

23   A.    I said, "And somebody else".  But she was just concerned

24   because everyone was finding out quickly.

25   Q.    Do you remember, as you sit here today, what Misti said?

1    A.   Yeah.  She said, "How did you find out?  No one's supposed
2    to know that".
3    Q.   To know that Wop was involved?
4    A.   Yeah.
5    Q.   You said a moment ago that Wop and somebody else, did you
6    say that?
7    A.   Yeah.
8    Q.   And what was, what was -- what did you understand about
9    somebody else being involved?
10   A.   That's what I understand is that somebody else, that it
11   was Eric and him and somebody else.  That's all I know.
12   Q.   Who told you that somebody else was involved?
13   A.   I think Misti may have eventually.  I don't remember
14   exactly.  I can't tell you.  It's been a couple of years.
15   Q.   Okay.  After Eric was arrested, did you speak with him on
16   the telephone?
17   A.   Yes.
18   Q.   Did you and he ever talk about Wop?
19   A.   Yes.
20   Q.   Did Eric ever share with you an understanding of what Wop
21   was supposed to do?
22   A.   He wanted Wop to take care of him.
23   Q.   And what did you understand "to take care of him" mean?
24   A.   He wanted him to get him a lawyer and stuff, put money on
25   his books.

1    Q.   During those jail calls with Eric, did you or he ever use

2    the N-word?

3    A.   Probably.

4    Q.   Ma'am, do you consider yourself to have a bias against

5    colored people?

6    A.   No.

7    Q.   Does the fact that the defendant in this case, does the

8    fact that he is a black man affect the accuracy of your

9    testimony in any way?

10   A.   No.

11   Q.   Can we please call up Exhibit 58, which was previously

12   admitted?  You're going to see something on the screen in front

13   of you.  Can we zoom in on the top half of this phone, please,

14   Erin?  Thanks.  So, by reference to Exhibit 58, do you

15   recognize this?

16        (Government Exhibit 58 was shown to the Witness.)

17   A.   Yeah.

18   Q.   What is this?

19   A.   Text message of Wop's girlfriend texting me for Eric.

20   Q.   You said Wop's girlfriend?

21   A.   Yeah.

22   Q.   And who is Wop's girlfriend?

23   A.   This girl.  I said I'm assuming this woman, because she

24   said she was his girlfriend.

25   Q.   Okay.  So the woman who is sending you -- and you said

1    text messaging.  Is this actually a Facebook Messenger?

2    A.    Yes.

3    Q.    And this came to your Facebook account?

4    A.    Yes.

5    Q.    And a woman whose Facebook account read, was corresponding

6    with Jayme Sartelle sent you a message, "Hello.  How you doin?

7    My husband is Wop.  He's trying to get ahold of Eric.  Could

8    you please have him reach out to him?  TY".  Did I read that

9    correctly?

10   A.    Yes.

11   Q.    And am I right that you responded, "Yeah.  I can.  I think

12   he's having a problem with his phone"?  Did I read that

13   correctly?

14   A.    Yes.

15   Q.    And the date associated with this message is December 8th

16   of 2021; is that right?

17   A.    Yeah.

18   Q.    At that time, did you understand Wop's source or Eric's

19   source of supply to go by the name of Wop?

20   A.    Yeah.

21   Q.    Can you zoom back out, please?  And then can you zoom in

22   on the bottom half, please?  So then, by reference to this same

23   exhibit that we're looking at, there's an exchange that began

24   on December 11th 2021 in which you write, "Hey, I'm with Eric.

25   He's trying to get ahold of him.  Hey, I'm with Eric".  Did I

1    read that correctly?

2    A.    Yeah.

3    Q.    Go to the next page, please, and then the top four

4    messages, please.  Thank you.  And then we see those same

5    messages on the next page, and the response is, "I tried to

6    text E.  I'm not home, but he's there waiting for him".  Did I

7    read that correctly?

8    A.    Yes.

9    Q.    What, can you explain to the jury what's going on here

10    during these messages?

11    A.    I don't know.  Eric asked me to get a hold of him for him.

12    He just told me to text him, and that was that, what's going

13    on.

14    Q.    To get a hold of?

15    A.    Wop.

16    Q.    And then the bottom half of the page, please, Erin?  Thank

17    you.  The next message comes in on a date June 19th.  Do you

18    see that?

19    A.    Yeah.

20    Q.    Oh, I'm sorry.  Can you scroll up a little bit higher?

21    Thank you.  And, Ms. Dragon, am I right that you provided

22    this --

23    A.    Yes.

24    Q.    -- this phone to the agents for them to take the photo of

25    it; is that right?

1  A.  Yes.

2  Q.  And this was your phone?

3  A.  Yeah.

4  Q.  And, on the date June 18th, you get a message from Jayme

5  that reads, "Hey hun, can you send me your number?"  Did I see

6  that correctly?

7  A.  Yes.

8  Q.  And then you responded with a phone number that ends in

9  0206; is that right?

10  A.  Yes.

11  Q.  And was that your phone number?

12  A.  Yes.

13  Q.  Showing you what's been marked as Exhibit 59, do you

14  recognize that?

15      (Government Exhibit 59 was shown to the Witness.)

16  A.  Yeah.

17  Q.  What is this?

18  A.  My text messages.

19  Q.  Between you and a cell phone ending in 1056?

20  A.  Yeah.

21  Q.  And this was an image from your phone that you let the

22  agents take a picture of?

23  A.  Yeah.

24      ATTORNEY DRESCHER:  Your Honor, I'd move the

25  admission of 59.

1          ATTORNEY MATSON:  No objection.

2          THE COURT:  Admitted.

3     (Government Exhibit 59 is admitted into evidence.)

4  BY ATTORNEY DRESCHER:

5  Q.   Can we please zoom into the top half, please, Erin?  So,

6  in the top half of this screen, we see the phone number that's

7  communicating with you; is that right?

8  A.   Yeah.

9  Q.   And the person using that phone says, "Hey, how are you?

10  Hey, need some help".  Did I read that correctly?

11  A.   Yeah.

12  Q.   And your response on July 16th reads, "Who's this?"  Did I

13  read that correctly?

14  A.   Yes.

15  Q.   And the response was, "E friend".

16       Who did you understand to be sending these messages?

17  A.   I assumed it was -- I didn't know at first until --

18  Q.   Well, at the time you were receiving these messages --

19  A.   I didn't really know, to be honest with you.

20  Q.   You didn't know at the time?

21  A.   No, not automatically.  It took me a bit.

22  Q.   And the date we're looking at here in July, do you recall

23  what year we're talking about now?  Was this after Eric had

24  been arrested?

25  A.   Yeah.

1  Q.   So would that have been 2022?

2  A.   Yeah.

3  Q.   Can we see the rest of the exhibit, please, starting with,

4  "E friend"?  So he writes, "E friend.  Sorry.  Need some help

5  around here.  If you can point me in the right direction, 2

6  percent".  Did I read that correctly?

7  A.   Yes.

8  Q.   What do you understand that to mean?

9  A.   I don't know.

10  Q.   If you can -- "Need some help around here", what did you

11  understand that to mean?

12  A.   I don't know.  Maybe he needs help getting rid of drugs.

13  Q.   Can you please speak into the microphone?

14  A.   Maybe he needs help getting rid of drugs.

15  Q.   And then, on the next page of this exhibit at the,

16  starting with the, starting right there, Erin, please, to the

17  bottom, here we see a continuation of what we saw on the

18  previous screen; is that right?

19  A.   Yes.

20  Q.   And then it reads, "I forgot you pregnant", and then you

21  said, "How did you get my number?"  Did I read that correctly?

22  A.   Yeah.

23  Q.   And he responded, "You gave it to my girl".  Did I read

24  that correctly?

25  A.   Yeah.

1    Q.   After Eric had been arrested, were you ever at Misti's

2    house when she was on a FaceTime call with Wop?

3    A.   Once.

4    Q.   Now, had you seen Wop in person previously?

5    A.   No, not really.  I, I was at -- I think I, like, crossed

6    paths with him, but I never had seen him.

7    Q.   You crossed paths with him?

8    A.   Yeah.

9    Q.   What does that mean?

10   A.   Like, I was walking in as he was walking out.

11   Q.   You were walking in?

12   A.   Or he was walking in as I was walking out.

13   Q.   He was coming in as you were going out?

14   A.   Yeah.

15   Q.   Of where?

16   A.   Misti's.

17   Q.   And so then, after Eric's arrest, you were at Misti's, and

18   Misti is on a FaceTime call with him?

19   A.   Yeah.

20   Q.   And then, at some point, did you become part of this

21   FaceTime call?

22   A.   No.  I was just kind of sitting next to Misti.

23   Q.   Okay.  At some point during this FaceTime call, did you

24   participate in it?

25   A.   I didn't say nothing.

1  Q.  You didn't say anything?  Did Misti --

2  A.  No.

3  Q.  -- and the person behind -- did Misti and Wop talk about

4  you while you were there?

5  A.  I think she told him that I was sitting there is what, how

6  it happened.

7  Q.  What did Misti say about you?

8  A.  That I was sitting next to her.

9  Q.  And did Wop say anything to you?

10  A.  Not directly to me.

11  Q.  What did he say?

12  A.  I don't know.  He just said that he'd make sure that we

13  were taken care of or whatever.  I'm not really sure.  It's

14  been two years.

15  Q.  Can I refer your attention to Page 22 of your grand jury

16  testimony that's in front of you, Exhibit 107?  Can you please

17  turn to Page 22?

18      Before I ask you about your grand jury testimony, do you

19  remember when you -- do you remember seeing the cell phone that

20  Misti was using during this FaceTime call?

21  A.  Yes.

22  Q.  You can put the testimony down for a second.  Do you

23  remember seeing a name associated with the person that Misti

24  was communicating with --

25  A.  Yes.

1    Q.    -- on her phone?

2    A.    Yeah.

3    Q.    Do you remember the name you saw?

4    A.    Dominique.  I don't know.  I didn't know exactly what it

5    was.

6    Q.    It was something like Dominique?

7    A.    Yeah.

8    Q.    And then, at Page 22, Line 7, I asked you -- and this was

9    back in September of 2022, right, when you were in the grand

10   jury?

11   A.    Yes.

12   Q.    And I asked you, "Okay.  Describe this FaceTime call at

13   Misti's house with Wop" and your answer was, "So, like, Misti

14   was kind of nervous to talk to him, and they were talking about

15   wanting to meet up and talk about the situation.  They were

16   both, like, saying things, but they, like, weren't really

17   saying them.  They were talking about the incident but were

18   trying not to talk, like, not to say the words at the same

19   time, and, at one point, he saw me in the phone call, and he

20   asked who it was, and Misti had told him that it was me, and

21   she, and he had said that he's -- he said, I'll make sure and

22   your kids are taken care of".  Did I read that correctly?

23   A.    Yeah.  I don't -- I think it was, like, towards me and

24   Misti, though.

25   Q.    Can you speak into the microphone so I can hear you?

1    A.   Yes.

2    Q.   And that's an accurate description of what happened on

3    that call?

4    A.   Yeah.

5    Q.   And how did his statement that he'll make sure your kids

6    are taken care of, what did you understand by that?

7    A.   I just assumed, like, that it meant not to talk to people.

8             THE COURT:  I'm sorry.  I couldn't hear what you

9    said.

10   BY ATTORNEY DRESCHER:

11   Q.   Can you please speak into the microphone so we can hear

12   you?

13   A.   I don't think it was like a direct threat, but I think,

14   you know -- I don't know how to say it.  Just so, because he

15   doesn't want people talking about him.

16   Q.   Let's look at your testimony.  After you explained I'll

17   make, that he had said, "I'll make sure and your kids are taken

18   care of", you testified in the grand jury, "And I felt that as

19   a threat, pretty much, because of how they were speaking".

20   A.   Right.

21   Q.   That was your testimony in the grand jury, wasn't it?

22   A.   Yeah.

23   Q.   And that's how you felt during that phone call?

24   A.   Yeah.

25   Q.   Was this the first time you'd had any interaction with

1    Wop?

2    A.   Yeah.

3    Q.   Is that a "yes"?

4    A.   Yes.

5              ATTORNEY DRESCHER:  Thank you.  No further questions.

6              CROSS-EXAMINATION BY ATTORNEY MATSON

7    Q.   Good morning, Ms.Dragon.  How are you?

8    A.   Not good.

9    Q.   Not great?  I'm Chandler Matson.  I have a few questions

10   for you too.  I understand you don't want to be here, and

11   that's okay.  I'll try and move quickly, okay?

12        Ms. Dragon, you're not together with Eric Raymond anymore,

13   right?

14   A.   No.

15   Q.   But in 2021 and 2022, you were boyfriend/girlfriend?

16   A.   Yes, for a few months.

17   Q.   For a few months?  Did you first get together in October

18   of 2021?

19   A.   Yes.

20   Q.   Did, it seems that, at the time, maybe Eric had a crack

21   addiction, right?

22   A.   Yes.

23   Q.   And a heroin addiction?

24   A.   Yes.

25   Q.   Did Eric introduce you to crack?

1    A.    Yes.

2    Q.    Did he pressure you to do crack, or did it just sort of

3    happen?

4    A.    No, it just sort of happened.

5    Q.    Okay.  Did Eric do crack constantly during that time?

6    A.    Yes.

7    Q.    Yeah?  All day and every night?

8    A.    Yes.

9    Q.    Heroin as well?

10   A.    Not as often, but yes.

11   Q.    Yeah?  I think you've previously stated that he didn't

12   sleep for weeks at a time; is that true?

13   A.    Yeah.

14   Q.    All right.  Eric was pretty out of control during that

15   time in other ways, right?

16   A.    Yeah.

17   Q.    You're aware that he was on house arrest on 2021, supposed

18   to be staying at Misti-Lyn Morin's 24/7; did you know that?

19   A.    No.

20   Q.    No?  Okay.  Did you know he had charges in Franklin

21   Superior Court that required him to be at Misti-Lyn's all the

22   time?

23   A.    I didn't find any of that out until after.

24   Q.    Okay.  So you didn't know that Misti-Lyn Morin was his

25   responsible adult?

1    A.    I don't think so.

2    Q.    Okay.  I mean, he was staying at your house, anyway,

3    right; he wasn't staying at Misti-Lyn's?

4    A.    No.  He was staying back and forth between there and his

5    sister's house.

6    Q.    Okay.  So he'd go back?  Sometimes he'd stay at Misti's;

7    sometimes he'd stay at your place?

8    A.    Yeah.  He wasn't living with me, though.

9    Q.    Was Eric dealing drugs out of your house?

10   A.    No.

11   Q.    Do you remember when the police executed a search warrant

12   on January 14th?

13   A.    Yes.

14   Q.    They came to your house, right?  You didn't want them to

15   come in, obviously?

16   A.    No.

17   Q.    You were pretty upset that they were coming into your

18   house, right?

19   A.    Yeah.

20   Q.    I think you told them that Eric wasn't there, right?

21   A.    Yeah.

22   Q.    Eric was there, right?

23   A.    Yeah.

24   Q.    And, when the police went into a bedroom, they found Eric,

25   right?

```
 1    A.    Yeah.

 2    Q.    And they found 92 small, white tablets, right?

 3    A.    I'm not sure.  I don't know exactly.

 4    Q.    Well, let me ask you this:  Were those -- did you have 92

 5    small, white tablets in the bedroom?

 6    A.    I don't know.

 7    Q.    Okay.  They found a scale, right, in that bedroom?

 8    A.    Yeah.

 9    Q.    Was that your scale?

10    A.    Actually, yeah.

11    Q.    That was your scale?

12    A.    No, it wasn't mine, but --

13    Q.    Okay.  Eric was in that bedroom, right?

14    A.    Yeah.

15    Q.    They also found a 5.56 rifle round in the bedroom, right?

16    A.    Yeah.  I'm not exactly sure what they found.

17    Q.    Okay.  Did you have ammunition in the bedroom, or was that

18    Eric's?

19    A.    I didn't, but I did have a rifle.

20    Q.    I'm sorry.

21    A.    I didn't have any of this.  None of my stuff was in the

22    bedroom, but I did have a rifle at the house.

23    Q.    Okay.  So the 38 auto round, was that yours, or was that

24    Eric's?

25    A.    I don't know.
```

1    Q.   Okay.  The ProTac weapon light with a rail mount, was that

2    yours or Eric's?

3    A.   I don't know.  I don't know the name of the exact gun.  I

4    just had a hunting rifle that I used for deer hunting.

5    Q.   Were you dealing drugs out of your house?

6    A.   No.

7    Q.   Okay.  So a scale is typically involved in drug dealing,

8    right?

9    A.   Right.  I think it was just in Eric's stuff.

10   Q.   It was a digital scale, right, very precise scale?  It

11   wasn't the type that you would weigh yourself on; you would

12   weigh small amounts, right?

13   A.   Yeah.

14   Q.   And that's indicative of drug dealing, right?  Because you

15   want to know exactly how many grams are in something, right?

16   A.   Yeah.

17   Q.   And you weren't dealing drugs out of your house, right?

18   A.   No.

19   Q.   So it's fair to say that Eric was dealing drugs out of

20   your house, right?

21   A.   I think he had just spent the night and he brought his

22   stuff with him, and he laid it up on the bed and he took all

23   his stuff out and set it all over the place is what happened.

24   Q.   Got you.  So by stuff you mean the stuff that you would

25   use in drug dealing?

1    A.   Yeah.

2    Q.   Okay.  But he just brought it to your house --

3         (Court reporter clarification.)

4        So the stuff that he brought, he used in drug dealing, but

5    --

6    A.   I didn't know he had it until after.

7    Q.   Got you.  So he wasn't actively bringing customers to your

8    house?

9    A.   No.  He was sleeping when he was at my house.

10   Q.   Got you.

11       THE COURT:  If you could wait until he finishes his

12   question, wait a beat, and then answer, okay?  Because it will

13   make it possible for her to take down your testimony.

14       THE WITNESS:  Sorry.

15   BY ATTORNEY MATSON:

16   Q.   And I'll try to slow down too.  It's possible that Eric

17   was just packaging drugs at your house?

18   A.   It could have been possible, but he was probably just

19   carrying it around with the rest of his stuff.

20   Q.   Okay.  How did, how did Eric support his drug habit during

21   this time?

22   A.   By selling drugs.

23   Q.   Did he steal?

24   A.   I heard he has, but I never seen him do it.

25   Q.   Okay.  Were you with him at a Walmart in December?

1   A.   Yes, but we did not steal anything.

2   Q.   Understood.  The police had come to a Walmart and found

3   you and Eric in a car, right?

4   A.   With two other people that did steal stuff.

5   Q.   Who were those two other people?

6   A.   I don't even know their names, to be honest.  I know one's

7   Tanner, and that's it.  I don't know.  They were Eric's

8   friends.

9   Q.   The police found a 9mm magazine inside your purse?

10  A.   Yeah.

11  Q.   Whose was that?

12  A.   I don't know.  I found it on the floor of Misti's car.  I

13  picked all the stuff up and threw it in my purse so nobody got

14  in trouble.

15  Q.   Okay.  So you had taken -- well, Eric had taken Misti's

16  car; is that right?

17  A.   Yes.

18  Q.   And then picked you up, or were you with him when he first

19  got Misti's car?

20  A.   I don't remember.

21  Q.   Okay.  Regardless, at some point, you and the two

22  individuals in the back went to Walmart with Eric; is that

23  right?

24  A.   Yes.

25  Q.   In Misti's car?

1    A.   Yes.

2    Q.   And, when the police got there, you picked up a 9mm

3    magazine, and you hid it in your purse?

4    A.   Yeah.

5         ATTORNEY DRESCHER:   Objection, Your Honor, with

6    regard to basis of knowledge for the caliber of the magazine.

7    I don't think there's any evidence in --

8         THE WITNESS:   Yeah, I don't know what it is anyway.

9         ATTORNEY MATSON:   Okay.

10        THE COURT:   All right.   It's not really an

11   evidentiary objection.   Hang on just a sec.   But I'll, I'll ask

12   that you start over on that line of inquiry, okay?

13   BY ATTORNEY MATSON:

14   Q.   Did you understand it to be a magazine used for a firearm?

15   A.   Honestly, I didn't even known it was in my purse.   I was

16   just grabbing everything because there was a lot of

17   paraphernalia and just throwing it in my purse.   I didn't know

18   anything about a clip.

19   Q.   At some point, did you learn that it was a firearm

20   magazine?

21   A.   Yeah, when I got a warrant.

22   Q.   Okay.   At some point, did you learn that it was a 9mm

23   magazine?

24        ATTORNEY DRESCHER:   Objection.   Calls for hearsay.

25        THE WITNESS:   I don't know anything about --

1    THE COURT:  Wait, wait, just a sec.  Any, any

2    exception?

3        ATTORNEY MATSON:  No, Judge.

4        THE COURT:  Sustained.

5    BY ATTORNEY MATSON:

6    Q.   Thank you.  Sheila, did you know -- I'm sorry.  Ms. Dragon

7    or Sheila, do you prefer one or other?

8    A.   I don't care.

9    Q.   All right.  I'm more comfortable with Sheila if that's

10   okay.  Sheila, did Eric have guns in 2021 and 2022?

11   A.   Yeah.

12   Q.   Did you see him carrying guns?

13   A.   I didn't see him carry them, but I seen them in Misti's

14   home, I think.

15   Q.   You saw them at the place that they call the Tree House?

16   A.   Yes.  I didn't know it was called the Tree House until a

17   couple of days ago.

18   Q.   Okay.  So I'll just keep calling it Misti's house then.

19   You saw guns at Misti's house?

20   A.   Yeah.

21   Q.   Did you ever see Eric firing guns at Misti's house?

22   A.   No.

23   Q.   You just saw the guns were around?

24   A.   Yeah.

25   Q.   Multiple guns, not just one?

1     A.    Yeah.

2     Q.    Okay.  How many guns do you think you saw at Misti's

3     house?

4     A.    I have no idea.  A few.

5     Q.    Couldn't tell?  At some point -- well, let me back up for

6     a second.  Strike that.

7           Do you know who Jesse Sweet is?

8     A.    Yes.

9     Q.    At some point, did Jesse tell you that he wanted to rob a

10    plug at 45 First Street?

11    A.    I don't think so.

12    Q.    You think so?

13    A.    Not that I recall.  It wasn't about robbing him.

14    Q.    Did you recall at some point Jesse said that he wanted to

15    scare him out of his house?

16    A.    Yes.

17    Q.    Okay.  He wanted to scare this guy out of 45 First Street?

18    A.    Out of his own home.

19    Q.    Yeah.  He wanted to scare him with a firearm?

20    A.    No.

21    Q.    He just said, I want to scare this guy out of my house?

22    He didn't explain how he wanted to do that, huh?

23    A.    No.

24    Q.    That was the end of the conversation?

25    A.    Yeah.

1    Q.    Was Eric present for that conversation?

2    A.    Yeah.  It was more of their conversation than it was mine,

3    so I couldn't tell you.

4    Q.    Where was the conversation?

5    A.    I wasn't there for the conversation.  I had heard about

6    it, like, when Jesse had came to my house to get Eric.  Like,

7    they had had a conversation beforehand.  Jesse had came to my

8    house to get Eric, and I told him that he weren't going

9    nowhere.

10   Q.    So I'm sorry, Sheila.  I don't think I heard that last

11   part.  Jesse came to your house to get Eric?

12   A.    Yes.

13   Q.    And they had a conversation about Jesse wanting to scare

14   this guy out of his house?

15   A.    I don't think they said "scare".  Like, I just think that

16   they wanted, they just wanted to get him out.  But I recall

17   Eric telling me they didn't want to hurt him, they just wanted

18   to scare him.

19   Q.    Okay.  Did Eric ever express to you that he was going to

20   help Jesse scare this guy out of the house?

21   A.    Not that I remember.

22   Q.    Don't know?

23   A.    I just told him that they weren't going, and they didn't

24   go.

25   Q.    Did you ever do crack cocaine with Jesse?

1    A.   Yeah.

2    Q.   Was Jesse around a lot during this time?

3    A.   Yes.

4    Q.   When you did crack cocaine, were you at your house or at

5    Misti's house?

6    A.   I never really went to Misti's house until after this

7    situation.  I'd only been there a couple of times in the

8    driveway or walked in maybe once, but --

9    Q.   So I just want to be clear about what you heard Jesse's

10   plan was, and, if you didn't hear, okay, but did Eric state to

11   you that Jesse wanted to scare this guy out of the house at 45

12   First Street?  Did Eric say that to you?

13   A.   No.

14   Q.   Okay.  So he didn't say a week before the murder happened

15   --

16   A.   What they said was that they wanted the guy out of his

17   house and they didn't want to hurt him, but, yeah, I guess that

18   is what they said.  I can't remember.  It's been a long time.

19   Q.   Okay.  Your Honor, may I approach?

20       Sheila, do you have that grand jury testimony up there?

21   A.   Yes.

22   Q.   Can you turn to Page 13 and just review from Line 9

23   through Line 16?  Did you say that?

24   A.   Yeah, I said that, but I just missed a part, must be, when

25   I said it.

1    Q.   Okay.  So let's --

2    A.   I mean, I did say that, but it just didn't come out like

3    that.  You know what I mean?

4    Q.   Attorney Drescher asked you during your grand jury

5    testimony, "So tell the grand jury about you learning of some

6    plan to do something to the rival crack dealer".  Do you

7    remember that question?

8    A.   Yeah.

9    Q.   Okay.  And then you answered, "Eric had stated that he

10   wanted to go and scare this guy out of Jesse's house, and the

11   week before the murder had happened, Jesse had come to my house

12   and tried to get Eric to go with him to rob the guy".  Do you

13   see that?

14   A.   Yeah.  I didn't mean to say "rob", because I don't think

15   that was ever a plan.

16   Q.   But that's what you testified to in the grand jury, right?

17   A.   Yes, but I might have -- not sure.  I don't know.

18   Q.   And that was on September 8th 2022, right?  And that was a

19   lot closer in time to this event than now, obviously?

20   A.   Yeah.

21   Q.   Right.

22   A.   I guess it was -- I remember now, like, it was Jesse, but

23   I don't think Eric had any intention of robbing him, but that's

24   why Jesse wanted to do it was because Jesse wanted to rob him.

25   That's why he was, like, pushing Eric to do that.

1  Q.   What do you understand about when -- and by "this guy",

2  you now know they were talking about Elijah Oliver, right?

3  A.   Yeah.

4  Q.   What is your understanding about when Elijah Oliver got to

5  45 First Street?

6  A.   I didn't really know that he was even there until not long

7  before that happened.

8  Q.   So maybe about a week before the murder?

9  A.   Probably, like, two weeks, because it was a week before

10 that I had found out about it.

11 Q.   So a week before they --

12 A.   A little bit, yeah, I guess.  Like, I don't know.  I don't

13 know the exact dates on anything or how long anything was.

14 Q.   No, I understand.  Just, to the best of your recollection,

15 was it about a week before the robbery that you heard Elijah

16 was in town?

17 A.   Yeah.

18 Q.   Okay.  So it sounds like Elijah got to town and then,

19 almost immediately, there was a plan to at least scare this guy

20 out of the house, right?

21 A.   Yeah.

22 Q.   Is it your understanding that Jesse didn't like this guy?

23 A.   No.  He was selling drugs out of his home.

24 Q.   And he didn't like that, right?  Did he mention anything

25 about this guy and Siobhan Loyer?

1    A.    What?

2    Q.    Do you know who Siobhan Loyer is?

3    A.    Yeah.

4    Q.    Did Jesse say anything about this guy dealing with Siobhan

5    Loyer and not dealing with him?

6    A.    No.

7    Q.    Okay.  Sheila, did you go and live with Misti after the

8    robbery happened for a period of time?

9    A.    We hung out for, like, a week, but I didn't live with her.

10   I hung out with her for a week after that.

11   Q.    So --

12   A.    I wasn't living there.

13   Q.    -- you hung out with her for a week after the robbery?

14   A.    Yeah.  Or no, no, no.  That's what I'm trying to say.

15   After Eric went to jail.

16   Q.    I'm sorry.

17   A.    I misheard you.  I meant, like, after Eric went to jail is

18   when I went and stayed at Misti's for a few days and hung out

19   with her.

20   Q.    Okay.  Well, let's get the timeline then.  The robbery

21   happened on February 2nd, right?

22   A.    Okay.

23   Q.    Okay.  Is that your understanding?

24   A.    I can't tell you that.

25   Q.    Did Jesse -- sorry.  Did Eric go to jail about a week

1    after the robbery?

2    A.    It had been a few weeks, I had thought, but --

3    Q.    A few weeks?  Okay.

4    A.    I don't remember.

5    Q.    And that was the time that you moved in with Misti?

6    A.    I never moved in with Misti.

7    Q.    Okay.  Was there a time where you stayed at Misti's quite

8    a bit?

9    A.    Just for that week or so after Eric went to jail.

10   Q.    Okay.  That's what I'm trying to understand.  Eric went to

11   jail, and, for a week thereafter, you spent a lot of time at

12   Misti's, or you lived at Misti's for that week?

13   A.    I just spent a lot of time there.

14   Q.    Okay.  Just for a week?

15   A.    Yes.

16   Q.    After Eric went to jail?

17   A.    Yeah.

18   Q.    All right.

19   A.    Probably, like, five days.

20   Q.    Were you at Misti's the day after the robbery?

21   A.    I had stopped in.

22   Q.    You stopped in?

23   A.    Yes.

24   Q.    Okay.  How long were you there for?

25   A.    Not very long.  I rode with Amber to check on Eric.  I

1    wasn't there very long at all.

2    Q.   You went with Amber Raymond?

3    A.   Yes.

4    Q.   All right.  So you went to check on Eric with Amber

5    Raymond at Misti's?

6    A.   Yes.

7    Q.   Who was there at Misti's?

8    A.   I don't remember.

9    Q.   I'm sorry.

10   A.   Um, I guess, Jesse, Siobhan, Misti, Eric is all remember.

11   Q.   Okay.  Did you talk to those people about the robbery?

12   A.   No, not really.

13   Q.   Did you know about the robbery at that point?

14   A.   Yes.

15   Q.   Okay.  How did you learn about the robbery?

16   A.   The news.  It was all on the news.

17   Q.   The news?  Okay.  Had you communicated --

18   A.   I hadn't got a hold of Eric, so I went to Amber's, and

19   Amber and me went to check on Eric.  That's how it happened.

20   Q.   Okay.  So you go to Misti's.  All these people were there.

21   Everyone knows the robbery has occurred, and there was no

22   conversation about the robbery?

23   A.   I think Eric was just, like, out of it, and he was really

24   in shock and upset, so he was just in bed, and I don't think

25   anybody really talked about it.

1    Q.    Was he doing drugs?

2    A.    Yes.

3    Q.    Heroin?

4    A.    Yes.

5    Q.    Crack?

6    A.    Yes.

7    Q.    Was everybody else doing drugs as well?

8    A.    Yes.

9    Q.    Okay.  And do you remember Misti telling you that there

10   was a plan for her to drive Eric to do the robbery the weekend

11   before it happened?

12   A.    Yeah.

13   Q.    Okay.  And that plan involved her distracting this

14   individual named Squiggs?

15   A.    Yeah.

16   Q.    Do you know who Squiggs is?

17   A.    No.

18   Q.    No?  Would Gary Campbell ring a bell?

19   A.    Yeah, I heard of him.

20   Q.    Okay.  Gary Campbell and Squiggs are the same person?  And

21   then, at some point, did you learn from Misti that the guns

22   involved in the robbery had been thrown away?

23   A.    Yes.

24   Q.    Okay.  Now, you've talked a little bit about that FaceTime

25   call that you had with the individual that you refer to as Wop,

1    and you said you felt somehow intimidated by that?

2    A.    Yes, I was uncomfortable.  I was just uncomfortable with

3    the whole situation.

4    Q.    But have you, have you ever heard directly from my client

5    about any of this?

6    A.    No.

7    Q.    You have heard directly, though, from Eric telling you to

8    lie to the police, right?

9    A.    Yes.

10   Q.    Right.  Multiple times, as a matter of fact?

11   A.    Yes.  But then he did go back and tell me to talk to them,

12   and that's why I ended up doing it.

13   Q.    Well, Eric also learned that Amber had made a statement to

14   the police implicating him in the robbery, right?

15   A.    Yes.

16   Q.    And his response to that was to take you, and then he went

17   as well, to Amber Raymond's house, right?

18   A.    Yeah.

19   Q.    And then she and Eric had a conversation, right?

20   A.    Yes.

21   Q.    And then she changed her story to the police, right?

22   A.    Yes.

23   Q.    So safe to say Eric asked Amber Raymond, his sister, to

24   lie for him; is that right?

25   A.    I didn't hear it directly, but --

1    Q.    But that was the purpose of Eric Raymond's visit, to

2    change her story, wasn't it?

3    A.    I think his purpose of the visit was to figure out what

4    she had said.

5    Q.    Sure.  Let's look at cause and effect.  Prior to the

6    visit, he understood that Amber Raymond had made a statement

7    implicating him in the robbery, right?

8    A.    Yes.

9    Q.    After the visit, she changed her statement to the police;

10   is that right?

11   A.    I thought she had changed her statement before then.

12   Q.    In your words, "he went to Amber's house because he wanted

13   to confront Amber".  Do you remember saying that?

14   A.    Yes.  And then she said that she was sorry and she had

15   took back the statement is what she had said.

16   Q.    Okay, right.  Once confronted, she said, I'm sorry, I'll

17   take it back, right?

18   A.    Yes, but I think she was -- I don't know.  Yeah.

19   Q.    Once Jesse Sweet was arrested, he was detained; you know

20   that?

21   A.    Yes.

22   Q.    Because you talked to him in jail, right?

23   A.    Yes.

24   Q.    How long do you think you continued to talk to Jesse Sweet

25   for after the robbery?

1    A.    A lot longer than Eric.

2    Q.    Okay.  So you and Eric broke up fairly quickly?

3    A.    Yeah.  We didn't -- we never broke up.  I just stopped

4    talking to him.

5    Q.    Okay.  But you kept talking to Jesse Sweet?

6    A.    Yes.  I've known Jesse since we were kids.

7    Q.    And you did, in fact, talk to Eric Raymond while he was

8    incarcerated as well, right?

9    A.    Yes.

10   Q.    Okay.  And did you talk about this case?

11   A.    We could have.

12   Q.    Did you talk about what you should say to the police?

13   A.    We may have.  I don't remember.

14   Q.    Did you talk to Jesse about what Misti should say to the

15   police?

16   A.    We may have.

17         ATTORNEY MATSON:  Your Honor, it's already been

18   introduced, but I'd like to introduce Exhibit U.1, and this is

19   under the same parameters as prior jail calls.  It will not be

20   submitted for the jury to hear in the jury room.  It will just

21   be played in court.

22         ATTORNEY DRESCHER:  I appreciate the evidentiary

23   treatment of the call and how, the context, but I'm not sure

24   the auspice -- I'm not sure why it's relevant at this point.

25   I'm not sure it's a prior inconsistent statement.

1    THE COURT:  Right.

2    ATTORNEY DRESCHER:  And, well, actually, you know, I

3    have no objection.  He can go ahead and play it.

4    THE COURT:  Okay.

5    (A recording was played.)

6    BY ATTORNEY MATSON:

7    Q.   Do you recognize the voice on that call?

8    A.   Yeah.

9    Q.   Do you recognize that to be you and Jesse talking?

10   A.   Yes.

11   Q.   Okay.

12   (The recording was resumes.)

13   Q.   Did you hear that?

14   A.   Yes.

15   Q.   That was an unfortunate reference, wasn't it?  Yes?

16   A.   Yes.

17   Q.   But it was about Misti telling, right?

18   A.   Yes.

19   Q.   Telling on somebody, right?

20   A.   Yes.

21   Q.   And you said, "Any random N-word there is", right?

22   A.   Yeah.

23   Q.   Okay.

24   (The recording resumes.)

25   Pause there.  And that's you saying, "I would", right?

1    A.   Yeah, if I had --

2    Q.   Understood.

3         (The recording resumes.)

4         So, Sheila, I understand maybe times have changed and back

5    then maybe you were a different person, but that's the

6    unfortunate use of the N-word, isn't it?

7    A.   Yes.

8    Q.   And that's not the only time you've said things like that,

9    right?

10   A.   Probably not.

11   Q.   So, at that point, it would be safe to say that you did

12   have a bias against black people?

13   A.   I wasn't referring to black people, but, yes, I did use

14   that word.

15        ATTORNEY MATSON:  Your Honor, I'd like to introduce

16   Exhibit V.1 under the same parameters as the prior jail calls

17   we've been admitting.

18        ATTORNEY DRESCHER:  That's fine.

19        THE COURT:  Okay.

20        (A recording was played.)

21   BY ATTORNEY MATSON:

22   Q.   Did you hear that?

23   A.   Yeah.

24   Q.   Was there a time that people were on Facebook and

25   threatening you?

1  A.   Yeah.

2  Q.   And you described them as N-words?

3  A.   Yeah.

4  Q.   And that was related to the person that got murdered?

5  A.   Yeah.

6  Q.   You understood this to be people associated with the

7  person who was murdered?

8  A.   Yeah.

9  Q.   And they were threatening you?

10  A.   Yeah.

11  Q.   It had nothing to do with my client, right?

12  A.   No.

13       (The recording resumes.)

14       ATTORNEY MATSON:  Your Honor, may have one moment?

15  Thank you, Your Honor.  No more questions.

16       REDIRECT EXAMINATION BY ATTORNEY DRESCHER

17  Q.   Ms. Dragon, you testified that you stayed with Misti or

18  spent a lot of time with Misti for about five to seven days

19  after Eric was arrested?

20  A.   Yeah, I think so.

21  Q.   Was it during that time that the FaceTime exchange between

22  you and Wop occurred?

23  A.   Yeah.

24       ATTORNEY DRESCHER:  Thank you.

25       THE COURT:  All right.

1     ATTORNEY MATSON:  No, thank you.

2     THE COURT:  You're free to go.  That completes your

3   obligation to the court.  I appreciate your coming in.

4     ATTORNEY TURNER:  Your Honor, the government would

5   next call William Cleary.

6                    WILLIAM CLEARY,

7          having been duly sworn to tell the truth,

8                testifies as follows:

9          DIRECT EXAMINATION BY ATTORNEY TURNER

10  Q.   Good morning, Mr. Cleary.

11  A.   Good morning.

12  Q.   Can you please tell the members of the jury where you

13  work?

14  A.   Powderhorn Outdoor Sports Center.

15  Q.   And what is your position with Powderhorn Outdoor Sports

16  Center?

17  A.   I'm the owner, president.

18  Q.   How long have you operated Powderhorn Sports?

19  A.   This is the start of year 33.

20  Q.   And, in that long time you've operated it, are you

21  familiar with the firearms and ammunition that you sell?

22  A.   I am.

23  Q.   And are you familiar with the documentation and records

24  that are created and kept at Powderhorn Sports?

25  A.   I am.

1    Q.    Were you issued a subpoena in this case?

2    A.    Yes.

3    Q.    And that's why you're here today?

4    A.    It is.

5    Q.    And have you, as part of this case, have you provided

6    documents to law enforcement?

7    A.    We did.

8              ATTORNEY TURNER:  May I approach, Your Honor?

9              THE COURT:  Yes.

10   BY ATTORNEY TURNER:

11   Q.    Mr. Cleary, I've handed you what are marked as

12   Government's Exhibits 145 and 145A.  What are these documents?

13   (Government Exhibits 145 and 145A were shown to the Witness.)

14   A.    So they are photocopies of the ATF Form 4473, which is the

15   form that the buyer and seller have to fill out before a

16   firearm can be sold.

17   Q.    And are there also transaction receipts for sales at your

18   store?

19   A.    Correct.  There is, there are three receipts attached as

20   well.

21   Q.    Were these records made at or near the time of the events

22   they record?

23   A.    They are.

24   Q.    And are these records made and kept in the ordinary course

25   of business activity at Powderhorn Sports?

1   A.   They are.

2   Q.   And do you keep these types of documents secure at

3   Powderhorn Sports?

4   A.   We do.

5   Q.   And are Exhibits 145 and 145A true and accurate copies of

6   your records?

7   A.   They are.

8   Q.   And who do the documents in Exhibits 145 and 145A relate

9   to as the purchaser?

10  A.   The purchaser on 145 is listed as Dominique Troupe and on

11  145A the same, Dominique Troupe.

12          ATTORNEY TURNER:  Move to admit Government's Exhibits

13  145 and 145A.

14          ATTORNEY MATSON:  No objection.

15          THE COURT:  Admitted.

16   (Government Exhibits 145 and 145A are admitted into evidence.)

17  BY ATTORNEY TURNER:

18  Q.   Can we publish 145?  Go to 145.000040013.  You got it.

19  Mr. Cleary, is this record associated with the purchase of a

20  firearm from Powderhorn Sports?

21  A.   It is.

22  Q.   And you indicated that Mr. Dominique Troupe was the

23  purchaser of that firearm?

24  A.   Correct.

25  Q.   What address did Mr. Troupe provide?

1    A.    836 Bay Road, Number 2 in Colchester, Vermont.

2    Q.    And what was the firearm purchased?

3    A.    A Ruger Security-9, Serial Number 384-24546.

4    Q.    What caliber is that weapon?

5    A.    9mm.

6    Q.    And, if we turn to, I believe it's Page 5, what phone

7    number did Mr. Troupe provide related this transaction?

8    A.    He provided (802) 430-5367.

9    Q.    And when was this form completed?

10   A.    So the form was initially completed on 5/13/2021.  The

11   transaction was delayed, and then no response was provided by

12   NICS, so we were able to transfer the firearm after three

13   business days.  It looks like it was a little bit longer than

14   that when the customer came back, and the form was finally

15   completed on 5/24 of '21, and that's the date that the firearm

16   was transferred.

17   Q.    Okay.  And I'd like to look at Exhibit 145A, and is

18   Exhibit 145A also a record associated with the purchase of a

19   firearm from Powderhorn Sports?

20   A.    It is.

21   Q.    And who was the purchaser of this firearm?

22   A.    Dominique Troupe.

23   Q.    And, on this date, did Mr. Troupe provide the same address

24   at 836 Bay Road, Number 2 Colchester, Vermont?

25   A.    He did.

1    Q.    What was the firearm purchased on, in this form?

2    A.    This was a Glock 21.

3    Q.    And what caliber was this Glock 21?

4    A.    45.

5    Q.    And did Mr. Troupe provide a phone number related to this

6    purchase?

7    A.    Yeah.  The phone number provided was (802) 373-0711.

8    Q.    And was the purchase of this firearm completed by

9    Mr. Troupe?

10    A.    It was.

11    Q.    On what date?

12    A.    The firearm left the store on the 15th.

13    Q.    October 15th 2021?

14    A.    October 15th, yes.

15    Q.    Mr. Cleary, are you familiar with the models of firearms

16    here, the Ruger Security-9 and the Glock 21?

17    A.    I am.

18    Q.    Can you tell the jury if one of these weapons is larger

19    than the other?

20    A.    The Glock 21 is larger.

21    Q.    I'd like to look at, in Exhibit 145, Page 6 of that

22    document.  On the transaction on May 24th when Mr. Troupe came

23    in, what items did he purchase on that date?

24    A.    So there were four items, the Ruger Security-9, a box of

25    9mm ammo, and an inside-the-pant holster, and then a cleaning

1    kit.

2    Q.    The ammunition that Mr. Troupe purchased on that date,

3    what caliber is it?

4    A.    9mm.

5    Q.    How many grains is that ammunition?

6    A.    115-grain.

7    Q.    From your receipt, can you tell what brand the ammunition

8    is?

9    A.    Yes.  SB9A is the part in number for Sellier & Bellot 9mm

10   and 115-grain.

11   Q.    Mr. Cleary, are you familiar with the head stamp on

12   cartridges for this brand and caliber of ammunition?

13   A.    I am.

14   Q.    I'm going to bring up to you Exhibit 85B now, and I'm also

15   going to ask to pull up Exhibit 130K, which has previously been

16   admitted in evidence and I can represent to you is a more

17   close-up picture of the head stamp on that cartridge I've

18   handed to you.

19        Can you tell the members of the jury what the information

20   on that head stamp provides to you?

21   A.    So S&B is the manufacturer, which stands for Sellier &

22   Bellot.  9-by-19 is the official designation for 9mm, and '21

23   is going to be the year of manufacture.

24   Q.    And is this cartridge that's exhibited in Exhibit 130K and

25   the actual cartridge as 85B, is that cartridge consistent with

1    the ammunition you sold to Mr. Troupe on May 24th 2021?

2    A.    The only thing that I can't tell from this is what grain

3    the bullet is, whether it's a 115-grain or a 124.

4              ATTORNEY TURNER:  I pass the Witness, Your Honor.

5              CROSS-EXAMINATION BY ATTORNEY MATSON

6    Q.    Good morning.  It's Mr. Cleary?

7    A.    Good morning.

8    Q.    I'm Chandler Matson.  Mr. Cleary, 9mm ammunition, is that

9    fairly popular ammunition?

10   A.    It's probably one of the more popular, yes.

11   Q.    More popular in the world?

12   A.    Yes.

13   Q.    More popular that you sell?

14   A.    It is very popular, yes.

15   Q.    Yeah.  What about that 115-grain; is that a popular round?

16   A.    115-grain is popular.

17   Q.    It's not the only round, though, right, made available in

18   the 9mm?

19   A.    Not the only weight bullet, yes.

20   Q.    What other weights are there?

21   A.    124 and 147.

22   Q.    What's the difference?

23   A.    The higher the number, the more it physically weighs.

24   Q.    Are there different uses for those grains?

25   A.    Yes.

1    Q.   I should say different preferred uses for those grains.

2    What's the preferred usage of a 115-grain?

3    A.   Because it's lighter, it usually takes less metal, it's

4    less expensive.  So that one's used primarily for target

5    practice.

6    Q.   Okay.  What about the 124?

7    A.   That's a mixture of target practice and to be more similar

8    in weight to a, like a defensive round like a hollow-point.

9    Q.   What do you mean when you say "defensive", personal

10   protection?

11   A.   Ammunition that someone would purchase for defensive

12   purposes versus target practice.

13   Q.   Okay.  And what about the 147?

14   A.   More so for self-defense, and the other reason for 147 is

15   that it makes it subsonic, so it's quieter.

16   Q.   Is that why the 115 tends to be the most popular, because

17   it's used for a lot of target practice?

18   A.   I would say, just because of cost, it's the most popular.

19   It's the least expensive.

20   Q.   What about Sellier & Bellot?

21   A.   Sellier & Bellot.

22   Q.   Yeah.  Is that a popular brand?

23   A.   Yeah.  So, basically, it seems like on a yearly basis one

24   manufacturer tends to put out a better price than another, and

25   we, that particular year, you know, they had the best price.

1  So that's what we stocked for target ammunition.

2  Q.   All right.  So that's probably the one you sold the most

3  in that year?

4  A.   In that year, I would agree with that, yes.

5  Q.   And that's for target in this 115-grain range?

6  A.   Correct.

7  Q.   The purchases that were made by Mr. Troupe, that was in

8  May of 2021?

9  A.   Correct.

10  Q.   That form that was filled out, the firearm transaction

11  record, is that filled out for every firearm that you sell?

12  A.   Correct.

13         ATTORNEY MATSON:  Your Honor, may I have one moment?

14         THE COURT:  Okay.

15         ATTORNEY MATSON:  No questions.  Thank you.

16         ATTORNEY TURNER:  Just two quick.

17         THE COURT:  Of course.

18         REDIRECT EXAMINATION BY ATTORNEY TURNER

19  Q.   Mr. Cleary, you indicated you can't tell the grain from

20  the head stamp of the cartridge, but, if the projectile from

21  that cartridge was weighed, would you be able to tell the

22  grain?

23  A.   Yes.

24  Q.   Okay.  And could you estimate how many other brands make

25  9mm ammunition?

1    A.   Um, domestically, not a ton, Winchester, Remington,

2    Federal, but imported there's quite a few, I would say.  Total

3    between domestic and imported, there's probably 30-some-odd

4    brands of 9mm.

5    Q.   Thank you, Mr. Cleary.

6         ATTORNEY MATSON:  No questions.  Thank you.

7         THE COURT:  All right.  Thank you for making the

8    trip.  Appreciate it.

9         THE WITNESS:  All right.  And I'm assuming I'm just

10   going to leave this stuff right there?

11        THE COURT:  Leave it there.  He'll take care of it.

12   All right.  Why don't we take ten minutes off for the morning

13   break and look for you in a bit?

14        (A recess was taken from 10:22 a.m. to 10:48 a.m.)

15        THE COURT:  Good morning.  Good to see you.  All

16   right.  We'll bring in the jury in a moment.  Your next

17   witness?  Mr. Edson?

18        ATTORNEY TURNER:  Yes.

19        THE COURT:  Mr. Edson, it's nice to see you again.  I

20   want to make sure.  You have your attorney here, right, in the

21   courtroom?

22        THE WITNESS:  Yeah.

23        THE COURT:  Excellent.  Thanks for coming.  Ready for

24   the jury.

25        ATTORNEY TURNER:  And I apologize for the delay, Your

1    Honor.  We had to get the documents signed.

2              THE COURT:  Okay.  We can get jury now, I think.

3    There we go.  Sorry.

4              (The Jury enters the courtroom.)

5              THE COURT:  All right.  Next witness.

6              ATTORNEY TURNER:  The government calls Eric Edson,

7    Your Honor.

8              THE COURT:  All right.

9                   ERIC EDSON,

10             having been duly sworn to tell the truth,

11                 testifies as follows:

12             DIRECT EXAMINATION BY ATTORNEY TURNER

13   Q.   Good morning, Mr. Edson.

14   A.   Good morning.

15   Q.   Where are you from, Mr. Edson?

16   A.   Burlington, Vermont.

17   Q.   Okay.  And did you grow up in Vermont?

18   A.   Yes.

19   Q.   And how old are you, Mr. Edson?

20   A.   53.

21   Q.   And are you currently charged with certain federal crimes?

22   A.   Yes.

23   Q.   And what are those crimes?

24   A.   A Hobbs robbery.

25   Q.   And where, where is it alleged that that robbery occurred?

1    A.    Sierra Trading Post.

2    Q.    And does your federal charges, do they have any connection

3    to the case that's before the Court?

4    A.    No.

5    Q.    Okay.  Mr. Edson, do you have an extensive criminal

6    history?

7    A.    Yes.

8    Q.    And does it include approximately 40 felony convictions?

9    A.    Yes.

10   Q.    And about 20 misdemeanor convictions?

11   A.    Yes.

12   Q.    Have any of those convictions involved providing false

13   information to law enforcement officers?

14   A.    Yes.

15   Q.    I want to ask a little bit about the circumstances of

16   that.  Do you recall one of your cases involving false

17   information to law enforcement involved your truck being found

18   with a stolen trailer attached to it?

19   A.    Yes.

20   Q.    What was the false information that you provided to law

21   enforcement in that case?

22   A.    I believed my son had been driving the truck.

23   Q.    But that was not true, was it?

24   A.    Right.

25   Q.    Okay.  And, at that time, you weren't -- did you tell the

1    police that your son had stolen anything or stolen the truck?

2    A.   No.

3    Q.   And in another one do you recall being pursued by the

4    police with some excavation equipment attached to your vehicle?

5    A.   Yes.

6    Q.   And what information did you provide to the police in that

7    case that was false?

8    A.   I gave them a false name.

9    Q.   For yourself?

10    A.   Yes.

11    Q.   Mr. Edson, have you ever received a conviction for

12    providing false information in court?

13    A.   No.

14    Q.   And in those cases were you providing false information

15    that someone else had committed a crime?

16    A.   No.

17    Q.   Mr. Edson, have you entered into a cooperation agreement

18    with the United States?

19    A.   Yes.

20    Q.   And what is the requirements or the terms of your

21    cooperation agreement?  What do you have to do?

22    A.   Just be honest.

23    Q.   And you entered into that agreement this morning?

24    A.   Yes.

25    Q.   And, at the same time, you entered into a new plea

1    agreement for your charges relating to this Hobbs Act robbery

2    at the Sierra Trading Post; is that right?

3    A.   Yes.

4    Q.   Okay.  Had you entered into a plea agreement previous to

5    that?

6    A.   Yes.

7    Q.   And was that previous agreement signed on April 3rd 2024?

8    A.   Yes.

9    Q.   Okay.  And that previous agreement, where had you signed

10   that agreement?

11   A.   Here.

12   Q.   Here?

13   A.   Yeah.

14   Q.   So, on April 3rd 2024, you had come to this building to

15   sign that agreement, correct?

16   A.   Yes.

17   Q.   Okay.  And that older agreement on April 3rd 2024, what

18   were the terms of that agreement?

19   A.   78 months.

20   Q.   Your understanding was that you would serve 78 months for

21   the Hobbs Act robbery?

22   A.   Correct.

23   Q.   Okay.  And the new plea deal that you signed this morning,

24   what are the terms of that agreement?

25   A.   78 months.

1    Q.   Is it now a cap instead of a certainty of 78 months?

2    A.   It's a cap.  So it isn't going to go any higher than 78

3    months.

4    Q.   And you understand that, at the end, it's the judge who

5    will determine your sentence?

6    A.   Yes.

7    Q.   Do you also understand that, under your new plea agreement

8    and the cooperation agreement, that there's a five, what we

9    call a 5K provision of that where the government may ask you to

10   receive a reduced sentence due to your cooperation?

11   A.   Yes.

12   Q.   And did you enter into this agreement because you hoped to

13   receive a sentence lower than 78 months?

14   A.   Yes.

15   Q.   Do you understand, under this agreement, that, if you were

16   to lie under oath today, that your cooperation agreement would

17   be void and not willing to be used as benefits but you could be

18   tried for perjury?

19   A.   Yes.

20   Q.   Do you know Dominique Troupe?

21   A.   Yes.

22   Q.   And how do you know him?

23   A.   Throughout the years, mainly drugs.

24   Q.   Is Mr. Troupe seated in the courtroom today?

25   A.   Yes.

1    Q.   Could you describe him for the members of the jury by some

2    article of clothing or something that would help identify him?

3    A.   He's sitting in between the two attorneys.

4    Q.   And can you describe a piece of his clothing?

5    A.   He has a blue shirt.

6              ATTORNEY TURNER:  Your Honor, could the record

7    reflect that the witness has identified Mr. Troupe?

8              THE COURT:  Yes.

9    BY ATTORNEY TURNER:

10   Q.   You indicated that you had known Mr. Troupe for things

11   related to drugs.  Can you provide a little detail to the jury

12   about what those interactions had been?

13   A.   I just picked up a few ounces a couple of different times

14   in Colchester.

15   Q.   And how did those meetings come about?

16   A.   My brother-in-law lives in, or did live, in Swanton.

17   Q.   And who is your brother-in-law or was your brother-in-law?

18   A.   Ryan Spence.

19   Q.   And is Mr. Spence alive any longer?

20   A.   No.

21   Q.   Approximately when did he die?

22   A.   About two years ago.

23   Q.   Now, have you and Mr. Troupe also spent time together

24   when, at times, in the prison system?

25   A.   Yes.

1    Q.   Did you build a rapport with Mr. Troupe during those

2    times?

3    A.   Yes.

4    Q.   Has Mr. Troupe ever discussed this case with you?

5    A.   Vaguely, yes.

6    Q.   What did Mr. Troupe tell you about the case he has

7    pending?

8    A.   That somebody was basically stepping on his toes

9    financially in the area that he was mainly selling drugs in,

10   somebody came from another town and was basically, you know,

11   taking money away from him --

12   Q.   Okay.

13   A.   -- with drugs.

14   Q.   Did he tell you what happened to that person?

15   A.   He was killed.

16   Q.   Did he tell you how that happened and if he had any

17   involvement in it?

18   A.   His buddy had shot him.

19   Q.   Did Mr. Troupe indicate whether he was there on the night

20   that this individual was killed?

21   A.   Yes, he was, he was there with his, a couple of other

22   individuals.

23   Q.   And what was his role with regard to the events that

24   night, did he tell you?

25   A.   Basically, he was, had one of his buddies come from, up

1    from the city, and he basically was with the guys.  He

2    orchestrated it to have this guy taken care of.

3    Q.   Mr. Edson, were you transported from the Cheshire

4    Correctional Facility to this courthouse on April 3rd?

5    A.   Yes.

6    Q.   And why were you coming to the courthouse on April 3rd?

7    A.   For a plea bargain.

8    Q.   To enter into that previous plea agreement you had signed,

9    correct?

10   A.   Yes.

11   Q.   And appear before this court to enter your plea of guilty?

12   A.   This judge here, yes.

13   Q.   Okay.  On that date, were you transported with anybody

14   else?

15   A.   Yes.

16   Q.   Who were you transported with?

17   A.   Wop and another younger kid.

18   Q.   When you say "Wop", Mr. Edson, who are you referring to?

19   A.   I'm sorry.  Dominique.

20   Q.   Okay.  During that transport, did you speak with

21   Mr. Troupe?

22   A.   Yes.

23   Q.   What was the nature of that conversation?

24   A.   Basically, just catching up on, you know, talking with

25   each other and about the case and stuff, and he basically, you

1   know, wanted to know who I lived in the unit with and stuff,

2   and one of the informants in the case was actually in my unit,

3   and he basically --

4   Q.   Who was -- oh, sorry.

5   A.   Mr. Raymond.

6   Q.   I'm just going to finish my question so it's on the

7   record.  Who was the informant you're referring to, Mr. Edson?

8   A.   Mr. Raymond.

9   Q.   Did Mr. Troupe say anything about Mr. Raymond or call him

10  any names?

11  A.   Snitch.

12  Q.   Did Mr. Troupe ask you to do anything?

13  A.   He wanted me to relay some messages.

14  Q.   What were the messages that he wanted to you to relay?

15  A.   So, basically, tell Raymond that he knew, that he knew

16  that he had his -- because I guess Raymond owed him between

17  eight and ten grand, something like that, and --

18  Q.   How did you know that information, Mr. Edson?

19  A.   From, from Dominique.

20  Q.   Okay.  Sorry.  Go on.

21  A.   So he said tell him that he knew that he had his money,

22  that they went, that -- I'm supposed to tell this to Raymond,

23  that Raymond is going to say that he had his money and that

24  they went there to rob this guy for drugs, for dope.

25  Q.   Did Mr. Troupe indicate whether he wanted Mr. Raymond to

1  discuss whether or not Mr. Troupe was involved in going to rob

2  the gentleman of drugs?

3  A.   He was not involved.

4  Q.   Okay.  From your interaction, previous conversations with

5  Mr. Troupe, what was your belief as to whether he was asking

6  you to tell Eric Raymond to provide truthful or false

7  testimony?

8  A.   It was false testimony.

9  Q.   Did Mr. Troupe say anything about the families of people

10 who snitch?

11 A.   That about his mother.  He said his mother is, you know,

12 anything could happen.

13          THE DEFENDANT:  You deceitful liar.

14          ATTORNEY TURNER:  Your Honor, I'd ask you to instruct

15 --

16          THE DEFENDANT:  You're a deceitful liar.  Lies.

17          THE COURT:  Why don't we excuse the jury?

18          (The Jury leaves the courtroom.)

19          THE COURT:  All right.  Everybody have a seat,

20 please.  We'll give Mr. Troupe a minute to compose himself.

21          THE DEFENDANT:  You liar, deceitful liar.

22          THE COURT:  Mr. Troupe, talk to me, please.

23          THE DEFENDANT:  You know he's lying, Chandler.  You

24 know this.

25          THE COURT:  Mr. Troupe, Mr. Troupe.  Would you look

1 at me, please?

2    THE DEFENDANT:  I don't even know him.

3    THE COURT:  Mr. Troupe.  All right.  We'll take ten

4 minutes off, okay?  Mr. Matson -- we'll get back in ten

5 minutes, all right?

6    (A recess was taken from 11:04 a.m. to 11:15 a.m.)

7    THE COURT:  All right.  Two things.  First, I think

8 you owed me a word of warning before you disclosed the

9 incarcerated status of the defendant to the jury.  I would have

10 appreciated a heads up so I could at least think it through,

11 but that's water over the dam.

12   Turning to the question of behavior in the courtroom,

13 Mr. Troupe, I recognize that these are stressful times for you,

14 but it's really important that you sit, as you have been, in an

15 attentive, quiet type of a way because an outburst like that

16 isn't fair to you.  It's not fair to the government.  It's not

17 fair to the process.  So I know you've given this some thought

18 and talked probably privately to Mr. Matson about it.  It's

19 really important that you sit and give him notes, confer with

20 him as you have been, but not shout out your own thoughts in

21 front of the jury.  Is that fair?

22    THE DEFENDANT:  Yeah, I apologize, Your Honor.

23    THE COURT:  It's totally understandable, okay?

24 Anything else we need to take up?  Good enough.  We'll bring

25 the Witness back.

1       (The Witness resumes the stand.)

2       THE COURT:  All right.  I think we're ready for the

3  jury.  I'll just ask them to disregard the outburst, and we'll

4  move on.

5       (The Jury enters the courtroom.)

6       THE COURT:  All right.  Welcome back.  Trials can be

7  emotional moments for everyone involved.  I ask that you

8  disregard any outburst or statement and continue as you have

9  been listening carefully to the evidence, okay?  Fair enough,

10  thanks.

11  BY ATTORNEY TURNER:

12  Q.   Mr. Edson, did Mr. Troupe make any comments about the

13  family of Eric Raymond?

14  A.   I'm sorry.  What did you say?

15  Q.   Did Mr. Troupe make any comments to you on April 3rd about

16  the family of Eric Raymond?

17  A.   About his mother.

18  Q.   And what did he say about Mr. Raymond's mother?

19  A.   That she's still out there and vulnerable.

20  Q.   And how did you, what did you perceive that to mean?

21  A.   That, you know, he, the overall picture is that Eric's

22  cooperating and that, you know, his mother is still out there

23  and the shooter is still out there.  So the things that I was

24  going to say to him about his, about what Raymond should be

25  saying such as about the money, about going there to rob this

1  guy for dope, you know, that's what he wanted him to say.

2  Q.  Did you perceive the discussion of Eric Raymond's mother

3  as a threat?

4  A.  Yes.

5  Q.  Was it, how -- did you take that seriously?

6  A.  Yes.

7  Q.  How did you feel about Mr. Troupe asking you to deliver

8  this message to Eric Raymond?

9  A.  I had a lump in my throat because the van has audio and

10  video in it.  That was my understanding.  So, like, it's a big

11  deal.

12  Q.  What, where did you go after you met with Mr. Troupe that

13  day?

14  A.  We came here.

15  Q.  Okay.  And, at the end of day, where did you -- did you

16  get back on the van?

17  A.  Yes.

18  Q.  And what did you do when you returned to the Cheshire

19  Correctional Facility?

20  A.  I went to Raymond -- well, I ate and whatever, and then I

21  saw Raymond, and I basically had to make the choice then and

22  there what I was going to do, and I just basically told him

23  that I was, went to court with Dominique and that, you know, we

24  had a serious conversation, but I told him that he didn't have

25  to worry about me doing anything or feeling threatened, and I

1    said that, you know, basically, it was our secret about, you

2    know, that he's cooperating.  And an officer, I think,

3    overheard it, our conversation, because I think he wrote a

4    report.

5    Q.  Did you talk to correctional staff on the date that you

6    talked to Mr. Troupe about these events?

7    A.  Yes.

8    Q.  And did you provide the details of the conversation you

9    and I just talked about to that correctional officer on April

10    3rd?

11    A.  Yes.

12               ATTORNEY TURNER:  Pass the witness.

13               CROSS-EXAMINATION BY ATTORNEY MATSON

14    Q.  Mr. Edson, you don't know my client, do you?

15    A.  I know your client, yes.

16    Q.  No, you don't.  You don't know him from the streets.  You

17    never saw him prior to being incarcerated.

18    A.  Yes, I have seen him.  I've dealt -- my brother-in-law --

19    Q.  No, I didn't ask about your brother-in-law, Mr. Edson.

20    I'm asking about you.

21               THE COURT:  Could you just take it down a notch so

22    that our court reporter can keep up?

23    BY ATTORNEY MATSON:

24    Q.  I'm asking about you, Mr. Edson.

25    A.  Yes, sir.

1  Q.   You don't know my client other than when you were briefly

2  in the Cheshire County facility with him, right?

3  A.   No.

4  Q.   How is it even possible, Mr. Edson, that you knew my

5  client on the streets, outside?

6  A.   Because that's the life we live.

7  Q.   The life you live is one of incarceration.  Let's start

8  with February 26, 2021, arrested in Washington County, right?

9  A.   I guess.

10 Q.   Okay.  You have a felony conviction for grand larceny, and

11 you were incarcerated for two years thereafter.  That was the

12 punishment for that; is that right?

13 A.   I don't, I don't really recall.

14 Q.   It's probably tough because you have the most relentless

15 criminal record I think I've ever seen, but let's go to --

16         ATTORNEY TURNER:  Objection, Your Honor.  That's

17 argumentative, relentless criminal history.

18         THE COURT:  I'll allow the question to stand, but I'd

19 ask that you just take it down a notch and ask questions that

20 he can answer, okay?

21         ATTORNEY MATSON:  Certainly, Your Honor.

22 BY ATTORNEY MATSON:

23 Q.   Do you think you have a relentless criminal history?

24 A.   I don't know what you mean by that.

25 Q.   A criminal history that starts --

1    A.   I don't think it's about me.

2    Q.   -- that starts in 1987 and continues with a criminal

3    record every year all the way through 2021.  That's what I

4    mean.  Does that sound like a relentless criminal history?

5    A.   I can assure you that I have made some poor choices, but

6    one choice I have never done is, and the line I've never

7    crossed is murder or being implicated in threatening witnesses.

8    Q.   Well, I appreciate you saying that --

9    A.   All right?

10   Q.   -- because this charge that you're here in federal court

11   for, your charge, right, was robbing Powderhorn Sports, right?

12   A.   Say what?

13   Q.   Robbing Powderhorn Sports, or, sorry, not Powderhorn

14   Sports, Sierra Trading Post.  My bad.

15   A.   So I got --

16   Q.   Is that right?

17   A.   I got charged with the Hobbs robbery by threat or weapon.

18   Q.   Yeah.

19   A.   And it's yet to be decided on the actual events of that

20   day.

21   Q.   Sure.  You committed a robbery with a firearm?

22   A.   That's not true.  I went -- I'll tell you the -- I'll give

23   you the gist of it.

24   Q.   No, no.  I want to know what you pled guilty to.

25   A.   I went in there and, with somebody else that ran out of

1    the store.  I ran out with the goods and, which was stolen

2    sneakers and jeans, and outside of the store an altercation

3    with me and the security guard -- I didn't know it was a

4    security guard.  He said that what he thought was a weapon was

5    in my pocket and he thought that it was a weapon.

6    Q.   And you didn't utter the words, I'll blow your F-ing head

7    off?

8    A.   Now, that's what he said.

9    Q.   That's what he said you said --

10   A.   Yes.

11   Q.   -- right?

12   A.   I didn't say I said that.

13   Q.   No, no.  You're saying he's lying about you, right?

14   A.   So this is, so there was a -- I think there was a

15   misunderstanding about the actual words.

16   Q.   Mr. Edson, can you please listen to my question?  Did you

17   say, I'll blow your F-ing head off?

18   A.   So --

19   Q.   Did you say that or not?

20   A.   This is what I'm going say.  I don't remember the exact --

21          THE COURT:  Just a sec.  One at a time.  You've asked

22   him a question.  Give him the space to answer it, okay?

23          ATTORNEY MATSON:  Of course, Your Honor.

24          THE WITNESS:  I don't recall the exact words other

25   than I can tell you the nature of it was I was probably more

1    scared than he was.  The situation got out of hand.

2    BY ATTORNEY MATSON:

3    Q.   And he said that you --

4    A.   Okay?

5    Q.   -- told him, I'll blow your F-ing head off; isn't that

6    right?

7    A.   That's what he said.

8    Q.   Okay.  After that -- well, let's back get back to how

9    often you were actually on the street so that you could have

10   interacted with my client.  March 2019, you were arrested for

11   and convicted of a burglary, right?

12   A.   I don't know the exact dates.  All I can tell you is that,

13   throughout the years of him coming back and forth from the city

14   and dealing with my brother-in-law, I've met him a couple of

15   times in Colchester.  My wife's family is in Colchester.  My

16   employer is in Colchester, and I'm from Burlington, and that's

17   how I know him.

18   Q.   And you were sentenced to incarceration for one to five

19   years; is that right?

20   A.   I don't know.  I don't recall.

21   Q.   Hard to keep track, I understand.  You were also arrested

22   2019 in Chittenden County for petit larceny, right?

23   A.   Okay.

24   Q.   And you were sentenced to incarceration for five to six

25   months, right?

1    A.    Okay.

2    Q.    Mr. Edson, when you were, when you were detained on your

3    federal charges here, at some point, you were at Cheshire

4    County; is that right?

5    A.    Yes.

6    Q.    You were in the K-block unit; is that correct?

7    A.    Yes.

8    Q.    And that's where you say you were with my client for a

9    period of time?

10   A.    Yeah.

11   Q.    Are you on the MAT program?

12   A.    Presently, no.

13   Q.    But you were at that time, weren't you?

14   A.    I don't believe so.

15   Q.    Did you ever get sent to the hole for misusing your

16   buprenorphine?

17   A.    For diverting.

18   Q.    Diverting your buprenorphine?

19   A.    So I had some on --

20   Q.    No, no.  Mr. Edson, these are yes-or-no questions, okay?

21   A.    Okay.

22   Q.    Were you sent to the hole for misusing your buprenorphine?

23   A.    I was, yes, I was accused of that.

24   Q.    Okay.  And then were you taken out of K-block?

25   A.    Yeah.

1    Q.   And thereafter you were put in the block, in the unit with

2    Eric Raymond, right?

3    A.   Correct.

4    Q.   Okay.  So how long were you in K-block for before you

5    diverted your buprenorphine?

6    A.   I don't even remember, a couple, few months.

7    Q.   Do you remember when that was?

8    A.   It was -- I've been in Cheshire County for about seven

9    months, six months.

10   Q.   Okay.  So it sounds to me like you've been in the unit

11   with Eric Raymond for three or four months; is that right?

12   A.   No.

13   Q.   Two months?

14   A.   I was just in seg for 50 days.

15   Q.   Segregation for 50 days?

16   A.   Yeah.

17   Q.   Then you were released to Eric Raymond's unit?

18   A.   Yeah.

19   Q.   Okay.  Are you friendly with Eric Raymond?

20   A.   There's a -- I don't really see him a lot.  I mean, I am

21   friendly with pretty much everybody.

22   Q.   Okay.  And these units are about maybe twice the size of

23   this room, right?

24   A.   Yeah, probably three times the size of this room.

25   Q.   Okay.  And there's, there's cells up top, right --

1    A.   Yeah.

2    Q.   -- in that area, and then there's one big common area --

3    A.   Yeah.

4    Q.   -- about the size of this room, right --

5    A.   Right.

6    Q.   -- where everybody congregates, right?

7    A.   Yeah.

8    Q.   The reason I ask is because your testimony what you're

9    saying sounds an awful lot like Eric Raymond's testimony.

10   You're telling me that you discussed your, or Dominique's case

11   with Dominique, right?  That's what you've testified to today?

12   A.   A little bit.

13   Q.   Did you discuss Eric Raymond's case with Eric Raymond?

14   A.   Vaguely.  He doesn't talk much about his case.

15   Q.   Um-hum.  Understood.

16   A.   Like, yeah.

17   Q.   He doesn't talk about his case, but my client talks a lot

18   about his case; that's what you're saying?

19   A.   I mean, I don't think he talks a lot about his case

20   either.  I mean, like --

21   Q.   No.

22   A.   I don't know.  Only things I know is what basically have

23   been told to me, and, other than that, I don't, I didn't, like,

24   see the news or anything, so --

25   Q.   Mr. Edson, does everyone have their discovery in the

1    Cheshire jail, meaning the police reports, things like that?

2    A.    Say that again.

3    Q.    Does everyone, do all of the people who are awaiting

4    trial, do they have their discovery, the evidence, police

5    reports, things like that in the Cheshire County jail?

6    A.    No, not more so with the feds.

7    Q.    Did you have your discovery?

8    A.    I have thumb drives.

9    Q.    And on those thumb drives are there reports, statements,

10   witness affidavits?

11   A.    Police body footage and stuff like that.

12   Q.    The evidence in your case, right?

13   A.    The, yeah, but no one can have access to it, like.

14   Q.    Did Dominique have the evidence in his case when you were

15   with him in K-block?

16   A.    Did he have the evidence?

17   Q.    Um-hum.  Police reports, witness statements.

18   A.    He didn't show a lot of that stuff.

19   Q.    Okay.

20   A.    He doesn't show that.  Like, he doesn't --

21   Q.    Because he doesn't discuss his case, right?

22   A.    No, he does with certain people.

23   Q.    Okay.  Mr. Edson --

24   A.    We've had some pretty serious talks, and I think that's

25   probably why I'm here today.

1  Q.  Mr. Edson, you say that he was friends with a couple of

2  guys in K-block?

3  A.  I can tell you this:  I didn't just volunteer for this.

4  Q.  Well, Mr. Edson, your life got a lot better after you

5  volunteered for this; you wouldn't agree with that?

6  A.  Definitely not.

7  Q.  You had a plea agreement for 77 months.  It was a C plea;

8  is that correct?

9  A.  Say that again.

10  Q.  You had a plea agreement for 77 months, right?

11  A.  78 months.

12  Q.  Okay.  The initial one was for 78 months, meaning you were

13  going to get 78 months unless the judge rejected the plea

14  agreement; that was the first plea agreement?

15  A.  We didn't get that -- I was with this judge here.  We

16  didn't really get that far.  It was continued.

17  Q.  No.  Prior to you cooperation, prior to your cooperation,

18  the offer from the government --

19  A.  Yeah.

20  Q.  -- the plea agreement that you had was for an amount of

21  time certain, 78 months, right?

22  A.  78 months, yes.

23  Q.  And, now you've cooperated, the plea agreement is anywhere

24  from zero up to 78 months, right?

25  A.  I don't think it's zero.

1    Q.    You could ask for whatever you want, Mr. Edson.

2    A.    That doesn't mean I'm going to get it.

3    Q.    Nope.  But before you definitely weren't going to get it

4    because the plea agreement was 78 months, had to do it?

5    A.    We were -- I was here on the 3rd trying to argue for a

6    better sentence.

7    Q.    And you didn't get it until you cooperated?

8    A.    And the judge gave me a couple more weeks to consider what

9    we were going to do, and it was, that's literally what happened

10   and --

11   Q.    That's right.  And what happened is you cooperated, and

12   then you got a much better plea agreement.  That's a fair

13   statement.

14   A.    The way, the way I see it is I'm getting the opportunity

15   to argue for a lesser sentence.

16   Q.    That's right.  An opportunity that you didn't have before,

17   right?

18   A.    I don't know about that, but we were trying to argue for

19   less.  We were trying to get credit.  I was trying to get the

20   First Step program, and I was trying to get my stuff run

21   concurrent, and those are all questions that weren't answered,

22   and that's why I got another continuance.  So, more or less,

23   I'm still in the same position, but I'm going to be, have

24   another opportunity to be heard.

25   Q.    So, Mr. Edson, you had tried everything to get a lesser

1    sentence, and they offered you 78 months, have to do it?

2    A.    No.

3    Q.    You said you looked into the --

4    A.    We didn't --

5    Q.    Wait.  Mr. Edson, you said you looked into the First Step

6    Act, right, you looked into that?

7    A.    I did, yes.

8    Q.    Okay.  You looked into avenues that might be available to

9    get less than 78 months, right?

10   A.    Right.  With the good time, credit for time served --

11   Q.    Sure.

12   A.    -- it knocks it down to 4.5.  So I'd serve another couple

13   of years, but --

14   Q.    And getting that agreement for less than 78 months didn't

15   happen until you cooperated, Mr. Edson.

16   A.    No, we got to 78 months.  If I wanted it, I got it.

17   Q.    I said less than 78 months, Mr. Edson.

18   A.    Yes.  No.  Now, now it's a possibility.

19   Q.    That's right.  And you'll get a 5K letter if your

20   cooperation agreement is fulfilled, right?  You know what a 5K

21   letter is, right?

22   A.    Today I just learned what it was, yes.

23   Q.    Yeah.  It's a letter that goes to the judge from the

24   government saying, He cooperated, and you can consider

25   leniency, right?

1 A. You can consider leniency, yeah.

2 Q. That's how you understand it?

3 A. Yes.

4 Q. Your life got a lot better after you cooperated,

5 Mr. Edson.

6 A. It's not a lot better.  I, I was dragged into this whole

7 situation, okay?  And there was audio and video in the van, all

8 right?  I was dragged into it.  I'm not trying to lose the plea

9 that, even the plea that I did have, all right?  When the

10 government comes to you and they want the truth, I'm not going

11 to lie.

12 Q. So, Mr. Edson, there was also another person in the van

13 with you, wasn't there?

14 A. Yes, there was.

15 Q. And would that person corroborate what you have to say

16 today?

17 A. Yeah.  He's a younger kid, and it was Eric's roommate.

18 Q. And that person was Eric Raymond's roommate?

19 A. Yes.

20 Q. That person heard the conversation?

21 A. And he, and then I told him before he left the courthouse,

22 before we left, I said, "Do not go back and say anything to

23 your roommate because that's tampering with a federal witness".

24 I said that right in front of the Marshals.

25 Q. And then you -- I believe you said that right in front of

1    the Marshals.  I believe that's the only time you said that was

2    right in front of the Marshals so that the Marshals could hear

3    that.

4    A.    And I said it in front of the correctional officer.

5    Q.    And I believe you said it in front of the correctional

6    officer.

7              THE COURT:  Let me interrupt.  Just a question.

8              ATTORNEY MATSON:  Not a question, Judge.  I

9    appreciate it and withdraw that.

10             THE WITNESS:  I did not want this.

11             THE COURT:  Wait.  There's no question pending.

12             THE WITNESS:  Sorry.

13             THE COURT:  Okay?

14   BY ATTORNEY MATSON:

15   Q.    Mr. Edson, when you were dealing with my client out on the

16   streets, was he ever your codefendant in all these arrests that

17   you, that you had?

18   A.    No.

19   Q.    So is there any record out there of you being with my

20   client, dealing with my client, doing anything with my client?

21   A.    Him and I and my brother-in-law.

22   Q.    No, you and Dominique.

23   A.    Yes.

24   Q.    Where is that record, what record?

25   A.    Oh, I don't know.  If, I don't -- I, as far as I'm

1    concerned, I didn't want there ever to be any record.

2    Q.   Well, right.  I mean --

3    A.   Because it was always it was drugs, and it was felonies

4    and more trouble, and every time I got off into the Swanton

5    exit, I felt like the feds were following me, and it was just

6    not -- it was a bad life.  I've lived a really bad lifestyle

7    and --

8    Q.   So, Mr. Edson, my point is --

9    A.   Yeah.

10   Q.   -- in all the arrests for all of these convictions, all

11   the arrests that you've had, is there any police report ever

12   that will say you were with Dominique Troupe?

13   A.   To be honest, the feds could have been watching me then.

14   I don't know.  And him.  I don't know.

15   Q.   If so, tell me.

16   A.   But I'm definitely not going to say that I didn't meet up

17   with him because I know, like, they always have, they always

18   have the truth.  They always know everything that's going on,

19   and I'm definitely not trying to get myself in more trouble.

20   Q.   I believe that.  Mr. Edson, was there ever a time that you

21   were arrested when Mr. Troupe was around you, involved with

22   you, any police interaction whatsoever that would suggest that

23   you and Dominique Troupe were even present in the same place

24   together?

25             ATTORNEY TURNER:  Objection, Your Honor, asked and

1    answered.

2            THE COURT:  I think it's been asked, but I don't

3    think it's been answered, so I'll allow the question.

4            THE WITNESS:  Yeah, I don't know.

5    BY ATTORNEY MATSON:

6    Q.   Did you have a phone when you were out?

7    A.   I've had several phones.

8    Q.   Okay.  Did you turn those phones over to the authorities,

9    and did they look at them?

10   A.   No.

11   Q.   No?

12   A.   My phone was in the river.

13   Q.   You threw your phone in the river?

14   A.   Oh, God, I fell in the river.

15   Q.   So is there anything you could point to that might verify

16   anything that is, you have to say today?

17   A.   I don't know, I don't know, other than the audio-video on

18   the transport, and, yeah, I don't know.  I don't know what the

19   feds actually know, if they're watching.

20   Q.   I'm not asking what the feds know, Mr. Edson.  I'm asking

21   if there's anything that you want to point to that can verify

22   what it is you're saying.

23   A.   My brother-in-law is the only other person that was

24   involved with it, and he's passed away.

25           ATTORNEY MATSON:  Judge, I have no more questions.

1    Thank you.

2              THE COURT:  Anything further?

3              ATTORNEY TURNER:  Nothing further, Your Honor.

4              THE COURT:  All right.  Mr. Edson, I'll excuse you,

5    okay?

6              THE WITNESS:  Okay, sir.

7              ATTORNEY TURNER:  The government next calls

8    Dr. Elizabeth Bundock.

9                        ELIZABETH BUNDOCK,

10              having been duly sworn to tell the truth,

11                    testifies as follows:

12              DIRECT EXAMINATION BY ATTORNEY TURNER

13    Q.   Good morning, Dr. Bundock.

14    A.   Good morning.

15    Q.   Can you please tell the members of the jury who you're

16    employed by?

17    A.   I am employed by the State of Vermont.  I'm the Chief

18    Medical Examiner.

19    Q.   And, as the Chief Medical Examiner, what are your duties?

20    A.   The Office of the Chief Medical Examiner is responsible

21    for investigating deaths that occur within Vermont and

22    determining the cause and the manner of those deaths.

23    Q.   Dr. Bundock, what is your educational background?

24    A.   I've got an undergraduate degree in biology at the State

25    University of New York in Purchase, New York, which is down

1   near the city, and then I entered a combined degree program

2   where I got my PhD in neuroscience and my medical degree.  So

3   I'm a physician.  And I completed those in 1999 and 2001.

4   Q.   Do you hold any certifications or licensures that are

5   relevant to your work, Dr. Bundock?

6   A.   Yes.  I am licensed to practice medicine in Vermont, and I

7   am certified by the American Board of Pathology in anatomic

8   pathology, neuropathology, and forensic pathology, which are my

9   specialties and subspecialties that I trained for through

10  residencies and fellowships in Massachusetts.

11  Q.   Dr. Bundock, how long have you been a medical examiner?

12  A.   I first became a medical examiner when I entered my

13  fellowship training in New York City as a New York City medical

14  examiner, and that was a one-year program, and immediately

15  after that I was in New York.  I'm sorry.  I went to

16  Massachusetts, and I was a Boston medical examiner, and I came

17  here about one year after that in 2007.  And so it's been since

18  2005 that I was a medical examiner in those various

19  jurisdictions.

20  Q.   Approximately how many cases have you worked on that

21  involved deaths by firearm?

22  A.   Hundreds, probably a little over 500.

23  Q.   Have you testified as an expert previously?

24  A.   Yes.

25  Q.   And approximately how many times?

1    A.    About 50 times.

2    Q.    Has your expertise ever been successfully challenged in

3    any court?

4    A.    No.

5    Q.    Did you prepare a report regarding the death of Elijah

6    Oliver?

7    A.    Yes, I did.

8    Q.    And, after you completed your report, did you arrive at a

9    conclusion regarding Elijah Oliver's cause of death?

10   A.    Yes.

11   Q.    And his manner of death?

12   A.    Yes.

13   Q.    And how did you use your training and expertise to reach

14   your conclusions?

15   A.    So I get investigative information, and I perform an

16   examination of the body, the outside of the body and then also

17   a full autopsy, looking at the inside, documenting injuries and

18   also if there is any natural diseases.  I use ancillary tests,

19   in this case, just toxicology, which is a blood test for drugs,

20   and then I integrate all of that information into my final

21   determination of the cause and the manner of death.

22   Q.    Did you conduct an autopsy of Elijah Oliver?

23   A.    Yes.

24   Q.    And when did you conduct that autopsy?

25   A.    That was February 3rd in 2022.

1  Q.  When you conduct an autopsy, how do you determine that the

2  body has not been altered or contaminated after it has left the

3  crime scene?

4  A.  So the body is placed in a body bag, and the zipper is

5  sealed, and then the body is transferred up from the scene to

6  our office and placed there under chain of custody, and then,

7  when I come to do the examination, I can verify that the seal

8  is intact.

9  Q.  As part of your autopsy process, do you or your staff take

10  photos of the body as you collect evidence?

11  A.  Yes.

12  Q.  And, in this autopsy, were you present for the taking of

13  those photos?

14  A.  Yes.

15  Q.  I'm going to ask to approach, Your Honor, with exhibits,

16  Government's Exhibits 90A through 90E.  Dr. Bundock, I'm going

17  to ask you to look at those exhibits and, after reviewing them,

18  could you let me know, Are those photos that were taken during

19  your autopsy of Elijah Oliver?

20       (Government Exhibits 90A-E were shown to the Witness.)

21  A.  Yes.

22       ATTORNEY TURNER:  Move to admit Government's Exhibits

23  90A through E.

24       ATTORNEY MATSON:  No objection.

25       THE COURT:  Admitted.  What were the numbers?  I'm

1    sorry.

2              ATTORNEY TURNER:  90A, alpha, through E, echo.

3              THE COURT:  Thank you.

4    (Government Exhibits 90A through E are admitted into evidence.)

5    BY ATTORNEY TURNER:

6    Q.   Upon, on sealing of the bag and getting a body out for an

7    autopsy, what is the process of beginning the autopsy?

8    A.   So I examine the body with the clothing, however received.

9    So I'm looking at the clothing, looking at the injuries if

10   they're already visible without undressing, looking at

11   identifying features of the person, and looking to see if there

12   is any particular trace evidence that needs to be collected.

13   Q.   And, with regard to Elijah Oliver's autopsy, what

14   observations about his clothing did you make?

15   A.   So I could see holes in the sweatshirt that were around

16   the left shoulder area, both on the side and on top and closer

17   to the neck.  There were a lot of bloodstains on the sweatshirt

18   as well, and some of the holes had discolor, a gray

19   discoloration around them.

20             ATTORNEY TURNER:  Your Honor, with regard to

21   publishing these photos to the jury, is there a manner where we

22   can only do that?

23             THE COURT:  Can I take a look?

24             ATTORNEY TURNER:  Yes.  Getting another copy for Your

25   Honor.  Sorry, Your Honor.  One second.

1    THE COURT:  You can display those on the overhead.

2    ATTORNEY TURNER:  Okay.

3    THE COURT:  We can put them on the overhead.

4    ATTORNEY TURNER:  Maybe I did not move to admit them.

5  I thought I did.

6    ATTORNEY MATSON:  I thought you did as well.

7  BY ATTORNEY TURNER:

8  Q.    Okay.  Dr. Bundock, what does Exhibit 90A show?

9  A.    This is an image of Elijah's sweatshirt, and you see a

10  gray case number.  That's our case number that's on a sticker.

11  And you're looking at the hoodie of the sweatshirt on the right

12  side of the image, and then there's a horizontal seam that

13  would be the top shoulder seam of the sweatshirt.  And you see

14  a large hole on the top left which would be over the sort of

15  biceps region of your, of his left upper arm.  There's a hole

16  at the bottom of the picture that is large and has some gray

17  discoloration, and then, in the red bloody area near the

18  shoulder seam, there is also more holes there.  And so all of

19  those holes correspond to the gunshot wounds.

20  Q.    Okay.  Now, moving to Exhibit 90B, I think this is a

21  close-up of one of those holes.  You had mentioned a gray,

22  sooty appearance.  Can you, just by touching the green, circle

23  what you were referring to as the gray, sooty evidence?

24  A.    I'm sorry.  Did you say I should describe it or --

25  Q.    If you touch the screen, you can show them where the

1    gray --

2    A.    Okay.

3    Q.    -- sooty --

4    A.    (Indicating.)  Okay.  There is a gray residue in this area

5    around the hole.  There is some even a little on the edges in

6    various places.

7    Q.    What is that?  Why is that relevant to your examination?

8    A.    This is consistent with gunpowder residue.  It is the

9    smoke component of what comes out of the end of a barrel when a

10    shot is fired, and this is an appearance that I see very often

11    and have seen many times.

12    Q.    Dr. Bundock, what did you determine Elijah Oliver's cause

13    of death to be?

14    A.    Gunshot wounds of the torso.

15    Q.    And what was Elijah Oliver's manner of death?

16    A.    Homicide.

17    Q.    How many gunshot wounds did your examination of Elijah

18    Oliver determine that he had suffered?

19    A.    He had been shot twice.

20    Q.    And you had identified in your report the two gunshots by

21    Roman numeral I and II; is that correct?

22    A.    Yes.

23    Q.    So I want to talk first about the one you had identified

24    as gunshot Roman numeral I, and can we look at Exhibit 90C?

25    What are we seeing in Exhibit 90C?

1    A.   This is a entrance gunshot wound on the top of Elijah

2    Oliver's left shoulder, not too far from the base of his neck,

3    and it, the hole is in the bottom third of the picture in line

4    with the letter A.

5    Q.   Did you make any other observations about the wound other

6    than that there was a wound?

7    A.   I describe it in my report.  There's some abrasion or

8    scraping along the edge of the wound closer towards the bottom

9    of the picture there.  That's from the bullet rubbing against

10   the skin as the bullet enters.  There's some blood around the

11   wound which is red, and then there are these little dark spots

12   all about on the skin surface, and some of those are gunpowder

13   granules, so the gunpowder that hasn't burned entirely, little

14   granules.  Some of the other stuff could be small bits of

15   blood.  So that's most of what you see in this picture.  Just

16   off the edge on the left side, there's another finding which is

17   an abrasion that is sort of black area on the kind of 9:00

18   o'clock position of that picture.

19   Q.   Dr. Bundock, what is stippling?

20   A.   So stippling is when the burning powder granules in the

21   gunpowder hit the skin and cause a little abrasion, a little

22   mark, a little injury on the skin's surface.  So they are

23   little punctate injuries, so it's referred to as stippling.

24   Q.   And what -- and did you note any stippling with regard to

25   this wound?

1   A.   There is an area of stippling nearby to this wound, and

2   then there is some powder granules that I can see on the

3   surface of this area.

4   Q.   What is that indicative of with regard to the range at

5   which the wound was suffered?

6   A.   So, when there's stippling, that means that the gun was

7   nearby to this decedent, and, if we take also into account that

8   there's powder, the smoke, the residue or on the clothing, this

9   was probably within just a couple of feet at the outside range.

10   Q.   The entrance of wound A, what was the track of that wound

11   through Elijah's body?

12   A.   Wound A went through the top of the left shoulder and went

13   through the left collarbone and the first rib on the left side

14   then through the lung and through the aorta, which is your

15   largest artery in your body which is coming out of the heart,

16   through the aorta and then eventually out the right side of the

17   back.

18   Q.   And, if we could look at Exhibit 90E, what, which one was

19   the exit wound for this gunshot?

20   A.   It's marked by the letter C.

21   Q.   With regard to the second gunshot wound that Elijah Oliver

22   suffered, can you describe the entrance point of that wound?

23   Where was it?

24   A.   The second wound, the entrance was on the front side of

25   the left upper arm.

1    Q.   Let me publish 90D.  And what does Exhibit 90D depict?

2    A.   This image shows the left shoulder and upper arm region of

3    Elijah.  The letter B is next to the second gunshot entrance

4    wound.

5    Q.   Was there any findings about this wound that were of note

6    to you?

7    A.   This wound has a very blackened edge, and so, within the

8    red oval area, you can also see a blackened red area here of

9    searing.  So there's enough heat from a nearby gun to actually

10   burn the skin surface.

11   Q.   And, Dr. Bundock, is that indicative that the firearm was

12   very close to Elijah Oliver's body for this wound?

13   A.   Somewhere between contact and loose contact, so very

14   close.

15   Q.   And what was the track of this gunshot wound through

16   Elijah Oliver's body?

17   A.   This gunshot wound went through the tissue above the

18   armpit, so all within the body -- didn't leave the body -- went

19   into his left chest and through the lung and went very steeply

20   downward through the body and came out the left flank area

21   which --

22   Q.   And which is the exit wound looking at Exhibit 90E?

23   A.   So the left flank wound, D, would be the exit for this.

24   Q.   Were any x-rays taken of Elijah Oliver's body?

25   A.   Yes.

1    Q.    And why do you take x-rays of a body during an autopsy?

2    A.    In this case, I take x-rays to determine if there is any

3    retained bullets, and we can also see fractures.

4    Q.    Did you review those x-rays in this case?

5    A.    Yes.

6    Q.    Did you make any conclusions as to whether there were any

7    projectiles retained in the body?

8    A.    There weren't.

9    Q.    Did you observe any other injuries to Elijah Oliver,

10   Dr. Bundock?

11   A.    Are you asking injuries other than the gunshot wounds?

12   Q.    Other than the gunshot wounds.

13   A.    Elijah had some scrapes and bruises on his face and right

14   upper arm and lower legs.

15   Q.    And what was, those injuries on his face, was the nature

16   of those injuries as with regard to any modality of causation?

17   A.    Abrasions and bruising or contusions are blunt injuries.

18              ATTORNEY TURNER:  Can we call up 90F just to the

19   Witness's screen?

20              THE COURT:  Just to the Witness's screen.

21              COURTROOM DEPUTY:  All right, Your Honor.  Hold on

22   one second.  Dr. Bundock, is there something on your screen?

23              THE WITNESS:  Yes.

24              COURTROOM DEPUTY:  Just make sure that the jury can't

25   see.

1       THE COURT:  Yeah, sure.

2  BY ATTORNEY TURNER:

3  Q.   Dr. Bundock, I believe you are seeing now what is

4  Government's Exhibit 90F.  Is that another photo from your

5  autopsy?

6       (Government Exhibit 90F is shown to the Witness.)

7  A.   Yes.

8  Q.   And does that represent Elijah Oliver's face?

9  A.   Yes.

10       ATTORNEY TURNER:  Move to admit 90F.

11       ATTORNEY MATSON:  No objection.

12       (Government Exhibit 90F is admitted into evidence.)

13       ATTORNEY TURNER:  May I publish it to the jury, Your

14  Honor?

15       THE COURT:  May I have a look?

16       ATTORNEY TURNER:  The paper copy is not in my folder,

17  unfortunately, Your Honor, which is why I was doing it this

18  way.

19       THE COURT:  Yes, you can publish it to the jury.

20  BY ATTORNEY TURNER:

21  Q.   Dr. Bundock, you had previously described some additional

22  injuries you had noted on Elijah Oliver's face.  I was asking

23  to publish 90F now to the jury.

24       COURTROOM DEPUTY:  It is.  Can I publish it to the --

25       THE COURT:  Yes, yes.

1    BY ATTORNEY TURNER:

2    Q.   What does Exhibit 90F depict compared to the injuries you

3    had just described?

4    A.   There is an abrasion or scrape that goes across the lower

5    lip, chin area.  There's a really tiny one on the nasal bridge.

6    And those are the only ones that's apparent in this picture on

7    the face.

8              ATTORNEY TURNER:  I pass the witness, Your Honor.

9              THE COURT:  All right.  Why don't we take a break for

10   lunch, get back at 1:00 o'clock?

11             ATTORNEY MATSON:  No questions, Your Honor.

12             THE COURT:  No questions?  All right.  That's even

13   easier.  Doctor, thank you for making the trip.

14             THE WITNESS:  Thank you.  Have a nice afternoon.

15             (The Jury leaves the courtroom.)

16             THE COURT:  Would you want a curative instruction

17   about the detention status of the defendant, or would you

18   rather that I not draw attention to it?  I'm happy either way.

19             ATTORNEY MATSON:  I would rather address that in my

20   closing, talk to them about it.

21             THE COURT:  In your closing?  Okay.

22             ATTORNEY MATSON:  Yes.  I think it's better coming

23   from me, Judge.

24             THE COURT:  That's fine.

25             ATTORNEY MATSON:  If that's all right.

1          THE COURT:  I just wanted to make on the record an

2    offer that I would be glad to put out an instruction that the

3    defendant's detention status is in no way an indication of

4    guilt or innocence since that's --

5          ATTORNEY MATSON:  And that's fine, Judge.  That's

6    fine.

7          THE COURT:  Do you want me to do that or no?  Or do

8    you want to talk about it over lunch?

9          ATTORNEY MATSON:  Let's talk about it over lunch.  I

10   jut find that sometimes drawing attention back to something

11   only reinforces it in their minds.

12         THE COURT:  Yeah.  No.  That's a decision you need to

13   make.  From the government's perspective, any input?

14         ATTORNEY DRESCHER:  We have no objection to an

15   instruction along those lines, that his status in custody is

16   not relevant to the consideration before them.

17         THE COURT:  Exactly.  Okay, good.  Thanks.  See you

18   in an hour.

19         ATTORNEY DRESCHER:  We may be resting when we come

20   back.

21         THE COURT:  Okay.

22         ATTORNEY DRESCHER:  So it may be a very short visit

23   with the jury, and then I presume there will be a motion to

24   take up, unless there's a defense case.  I don't know.

25         THE COURT:  Sure, yeah.  We'll deal with that at

1    1:00.  Thank you for letting me know.  So you'll kind of check

2    with the troops and make sure that everything's in that you

3    want in?

4            ATTORNEY DRESCHER:  Exactly.  That's why we didn't

5    want to do it spur of the moment here.

6            THE COURT:  Good, all right.  Thanks.

7        (A recess was taken from 12:04 p.m. to 1:03 p.m.)

8      (A conference was held outside the presence of the jury.)

9            THE COURT:  All right.  Have a seat everybody,

10   please.  Yet another note from the jury.  They have set a

11   record but it's a, it's an easy one.  It reads, "When we start

12   deliberating, will we be sequestered until we reach an

13   agreement, or will we be permitted to go home and come back to

14   finish?"

15       So I will tell them that we will not keep them overnight,

16   they'll be permitted to go home and complete their

17   deliberations on their own schedule, something like that.

18           ATTORNEY DRESCHER:  I think letting them know they're

19   not going to be sequestered should suffice.  In terms of

20   commenting on their own schedule, I don't know.  I mean, of

21   course, they have to figure it out on their own, but you'll

22   tell them and --

23           THE COURT:  They want to know if they're going to be

24   transported by a bus with the windows covered by newspaper and

25   kept in a hotel for a week.

1          ATTORNEY DRESCHER:  Right.  I think we all agree the
2    answer is "no".
3          THE COURT:  Yeah, yeah.  All right any further
4    evidence from the prosecution?
5          ATTORNEY TURNER:  No, Your Honor.  The government
6    will be resting.
7          THE COURT:  All right.  And, Mr. Matson, how about
8    from the defense?
9          ATTORNEY MATSON:  The defense rests, Your Honor.
10          THE COURT:  All right.  Before we get there,
11    Mr. Troupe, I wanted to speak frankly with you person-to-person
12    about your right to testify.  Do you understand that you have
13    every right to testify in this case if you wished to do so?
14          THE DEFENDANT:  Yeah, absolutely, Your Honor.
15          THE COURT:  And do you understand that the government
16    isn't permitted to call you as a witness against yourself
17    because you have a right not to incriminate yourself; do you
18    understand that?
19          THE DEFENDANT:  Yes, sir.
20          THE COURT:  Do you understand, though, that,
21    conversely, on the other hand, you have every right to speak
22    from the stand if you chose to?
23          THE DEFENDANT:  Yes.
24          THE COURT:  Do you understand that that's your right?
25    It's not your attorney's right.  It's not the Court's right.

1     It's nobody else's right except yours.

2               THE DEFENDANT:  Yes.

3               THE COURT:  And do you understand that you have, you

4     should have every opportunity to discuss that decision to

5     testify or not privately with your counsel; do you understand

6     that?

7               THE DEFENDANT:  Yes.

8               THE COURT:  Have you done so?

9               THE DEFENDANT:  Yes.

10              THE COURT:  You've had a chance to speak privately

11    with Mr. Matson?

12              THE DEFENDANT:  Yes, I have.

13              THE COURT:  Okay.  And is it your decision at this

14    point, having gotten advice from your attorney and having

15    thought it over, not to testify?

16              THE DEFENDANT:  Is it my decision?

17              THE COURT:  Yes.  What is your decision, is what I'm

18    trying to ask.

19              THE DEFENDANT:  Oh, I mean, I don't have any

20    information to testify, so, no, I didn't.  Yes.  Yeah, I'm not

21    testifying.

22              THE COURT:  Do you wish to testify, or do you wish

23    not to?

24              THE DEFENDANT:  No, not to.

25              THE COURT:  Sorry.

1        THE DEFENDANT:  Not to, Your Honor.

2        THE COURT:  Not to testify?

3        THE DEFENDANT:  Not to testify, yes.

4        THE COURT:  Okay.  Do you need any more time to think

5    over that decision?

6        THE DEFENDANT:  No.

7        THE COURT:  Okay.  I'll accept it.  I just wanted to

8    make sure that you and I speak frankly about it --

9        THE DEFENDANT:  Yeah.

10        THE COURT:  -- and that it's a personal decision that

11    you've made.  Is that how you see it too?

12        THE DEFENDANT:  Yes, it is, thanks.

13        THE COURT:  Okay.  Good enough.  So that will take

14    care of the question of rebuttal.  I'll call the jury in.  Any

15    response, Mr. Matson, to the curative instruction?  Is that

16    fair to you?

17        ATTORNEY MATSON:  Oh, yes, Judge.  Actually, I

18    emailed Mr. Howe and Jo about it.  We were thinking that maybe

19    it should go in the final jury instructions as opposed to

20    addressing it today.

21        THE COURT:  That's kind of up to the two of you.  Any

22    input from the government?

23        ATTORNEY DRESCHER:  I'm prepared to defer to

24    Mr. Matson's preference in that regard.

25        THE COURT:  Me too.  But, before I go there, any

1    improvement on the wording?

2           ATTORNEY DRESCHER:  On first read, no.  I think it's

3    consistent with what we talked about before the break, and, if

4    it goes in at the final charge, I'll have another chance to

5    read it before our conference in a couple of hours.

6           THE COURT:  Right, right.  So would you like it to be

7    read when they -- I'm going to bring them in in a minute, tell

8    them that they're excused for the day, the evidence is

9    concluded and they're going to come back on Monday for

10    arguments and the charge and deliberations.  I could read it

11    this afternoon, or I'm happy to include it in the jury charge.

12           ATTORNEY MATSON:  I would prefer Monday, Judge.

13           THE COURT:  Okay.  So I'll just find an appropriate

14    spot and slot it into the jury charge.

15           ATTORNEY MATSON:  Thank you.

16           THE COURT:  All right.

17           ATTORNEY DRESCHER:  And, just in terms of, well, for

18    lack of a better word, theatrics, when the jury comes in, we

19    will say that we are resting, and then Mr. Matson will have a

20    chance to -- okay.  Got it.

21           THE COURT:  Okay.  I think we're ready for the jury.

22           (The Jury enters the courtroom.)

23           THE COURT:  All right.  I'll start with the question

24    that I received.  The question was this:  "When we start

25    deliberating, will we be sequestered until we reach an

1   agreement, or will we be permitted to go home and come back to

2   finish?"

3       And the answer is that you'll not be sequestered.  You

4   will be permitted to go home at night, just as you have been,

5   subject to the same request that you not discuss the case with

6   friends or relatives, okay?

7       Any further evidence or witnesses from the government?

8               ATTORNEY TURNER:  No, Your Honor.  The government

9   rests.

10              THE COURT:  All right.  Mr. Matson?

11              ATTORNEY MATSON:  The defense rests.

12              THE COURT:  So that completes the presentation of the

13  evidence in the case.  I'll let you go now.  We'll return

14  Monday morning at 9:00 o'clock.  First up will be closing

15  arguments from the attorneys, and then I'll have legal

16  instructions to read aloud to you.  You'll get -- they're

17  fairly lengthy, so you'll get copies of them in paper form as

18  well, and then the case will be yours to resolve.

19      Having heard all of the evidence in the case, it's really

20  important, as it has been throughout, that you simply go home

21  to your families and your friends, have a weekend and not

22  discuss the matter.  You will have a chance to discuss it

23  amongst yourselves, but that request that you not do that

24  continues, of course.

25      But, now that you've heard all the evidence, people will

1    be very curious about what you've heard and what you think,

2    and, once you start down that conversation, it's really hard to

3    turn back.  So, if somebody asks you, obviously, you can tell

4    them that you've, you're in the middle of jury service.  My

5    suggestion is blame it on me.  Tell them that the judge

6    instructed you not to discuss it with anyone, even close

7    family, and just keep your counsel to yourself and come back

8    refreshed on Monday morning, and we'll start right off, as I

9    said, at 9:00 with the attorneys' closing statements, okay?

10   All right.  Good enough, thanks.

11              (The Jury leaves the courtroom.)

12              THE COURT:  All right.  Mr. Matson, is there a

13   motion?

14              ATTORNEY MATSON:  Yes, Judge.  I'd move for a

15   judgment of acquittal as to all counts and just reserve the

16   right to renew that if there is a verdict against my client.

17              THE COURT:  All right.  Did you want me just to --

18   what would you like me to do?  Because I can't --

19              ATTORNEY MATSON:  A perfunctory ruling, Judge, is

20   fine.

21              THE COURT:  A perfunctory ruling preserving the issue

22   for being renewed after a verdict if necessary?

23              ATTORNEY MATSON:  Correct, Judge, yes.

24              THE COURT:  Okay.  Does that work for the government?

25              ATTORNEY DRESCHER:  We oppose the motion, certainly,

1    and, if Your Honor wishes to hear from us, we'd be happy to

2    weigh in, but a perfunctory ruling denying the motion works for

3    us.

4              THE COURT:  Okay.  So I'll deny the motion at this

5    time, and that's obviously, under the rules, without prejudice

6    to your right to renew it as you choose after the verdict.

7              ATTORNEY MATSON:  Thank you, Judge.

8              THE COURT:  We should get together and speak about

9    the charge.  1:30, is that good for you?

10             ATTORNEY MATSON:  1:30?

11             THE COURT:  Yeah.

12             ATTORNEY MATSON:  Sure, Judge.

13             ATTORNEY DRESCHER:  I do have a suggested couple of

14   paragraphs that I think it might be worthwhile for me to email

15   around so we all have a copy of it relating to the Count Two

16   unanimity given the possession, the use, carry, and possess.  I

17   think the jury needs to be unanimous as to which of their

18   theories.

19             THE COURT:  Yeah, yeah, absolutely.

20             ATTORNEY DRESCHER:  So I have some language to

21   suggest in that regard.  If we could have -- I mean, can we

22   have until 2:00?

23             THE COURT:  Sure, 2:00 o'clock.

24             ATTORNEY DRESCHER:  That would be helpful.

25             ATTORNEY MATSON:  Judge, I circulated this morning in

1     an email, not directly to Your Honor --

2              THE COURT:  What's that?

3              ATTORNEY MATSON:  I circulated a red-line.

4              THE COURT:  I got it.  I just haven't had a chance to

5     look at it, but I do have it.

6              ATTORNEY MATSON:  Okay.

7              THE COURT:  And your client's welcome to attend, of

8     course.  It's up to him if he'd like to.

9              ATTORNEY MATSON:  I'll talk to him about it.

10             THE COURT:  Yeah.  It's kind of the lawyers talk, and

11    you are entirely welcome to come or not.

12             THE DEFENDANT:  I would love to be here, Your Honor.

13             THE COURT:  You're here.  That's good.

14             ATTORNEY DRESCHER:  So be back at 2:00?

15             THE COURT:  2:00 o'clock, we'll see you guys then.

16    Thanks.

17             (A recess was taken from 1:17 p.m. to 2:00 p.m.)

18             (The Charge Conference begins outside the

19              presence of the Jury.)

20             THE COURT:  We can bring Mr. Troupe down whenever he

21    is ready.

22             ATTORNEY MATSON:  I think that Mr. Troupe was maybe

23    not being entirely sincere, Judge.  Nonetheless, I talked to

24    him, and he's content not to be here.

25             THE COURT:  Are you sure?

1    ATTORNEY MATSON:  I am positive.

2    THE COURT:  Because I don't want any mistake on the

3    record.

4    ATTORNEY MATSON:  I can say unequivocally that he

5    does not want to be here.

6    THE COURT:  Okay, fair enough.

7    ATTORNEY MATSON:  I understand that sometimes the

8    record doesn't pick up things that aren't sincere, but his

9    comment was, I want to say, maybe snarky.

10    THE COURT:  What was that?

11    ATTORNEY MATSON:  I think he realized that these were

12    kind of like legal sort of maybe boring conversations, so he

13    was joking about wanting to be here.

14    THE COURT:  Oh, okay.

15    ATTORNEY MATSON:  Okay.

16    THE COURT:  It went right over my head.

17    ATTORNEY MATSON:  I know, Judge.  It wasn't the

18    perfect time for a joke.

19    THE COURT:  But, in all seriousness, you've had a

20    serious talk with him?

21    ATTORNEY MATSON:  I did.

22    THE COURT:  He's happy to absent himself from the

23    charge conference?

24    ATTORNEY MATSON:  Yes, absolutely, Your Honor.

25    THE COURT:  Got it, okay.  Let me just clean up a

1    little here because it's gotten to be a mess, and then we'll

2    get right to it.  All right.  Thank you for all your work on

3    this.  It's a little bit of a headache, this one.  So we'll go

4    page by page.  I'm looking at Draft 2.  Mr. Matson, I've got --

5    I'm actually working from your markup, so I've got your

6    comments in place, but we'll discuss them all.  Any suggested

7    changes through the first four pages of kind of standard

8    material?

9              ATTORNEY DRESCHER:  Not from the government.

10             ATTORNEY MATSON:  No, Your Honor.

11             THE COURT:  All right.  Turning to Page 5, Evidence,

12   I've got one proposed edit, which I don't think anything was

13   stipulated to, so I've just taken out the reference to facts

14   admitted by stipulation of the parties.

15             ATTORNEY MATSON:  Okay.

16             THE COURT:  It's not that kind of a case.  And I've

17   corrected -- on Page 6 there are four separate charges, not

18   six.  That's somebody else's case.

19             ATTORNEY DRESCHER:  Got it.

20             THE COURT:  Or maybe that was the original

21   indictment.  In any event, any other improvements to Page 5 or

22   Page 6?

23             ATTORNEY MATSON:  No, Your Honor.

24             ATTORNEY DRESCHER:  No.

25             THE COURT:  And that takes us to Page 7.  I don't

1    think we had any stricken testimony, so I'll take that out.  I

2    don't remember any.

3        Parties' Statements/Court's Rulings, I'll leave that in

4    place as the header.  That's an issue I hadn't really thought

5    of.  Mr. Matson, any objection to his point about that, if he

6    gets, asks a question that has the body of the factual material

7    and he gets a "yes", that that's to be considered?

8        ATTORNEY DRESCHER:  I think it's confusing.  I think

9    an answer to any question should be considered, whether it's

10   leading or open.

11       THE COURT:  Well, we've just finished saying that the

12   questions that the attorneys ask are not evidence in the case.

13   So I think the point he's making -- I've not heard somebody

14   make it before -- is that, if all he gets is a "yes" to his

15   question, they don't want them to set aside what he's asked

16   them because it comes in the form of a question.  I can't see

17   any harm in it.

18       ATTORNEY DRESCHER:  I mean, I think it may be less

19   confusing to simply say, It is the answers of the witness that

20   are to be considered as evidence, if you credit the witness's

21   answer, and not distinguish between, you know, different types

22   of questions.

23       ATTORNEY MATSON:  Perhaps we can just take out the

24   term, "Leading, facts contained in questions to which the

25   witness has assented".  I just get concerned because I do

1    think, especially in a case like this where my entire case has

2    been presented through cross-examination and leading questions,

3    which is essentially me testifying and asking for an

4    affirmation, the jury tends to dismiss what I'm saying.

5         THE COURT:  Yeah.  Where did you find this, just in

6    your head, or does it come from a book?

7         ATTORNEY MATSON:  I just, it's not the first time

8    I've proposed it, Judge, but, as far as I know, it's my idea

9    and mine alone.

10        THE COURT:  All right.  I'll go with it.  I see in

11   this case in particular.  I'll take out the "leading" because

12   that's kind of lawyers' talk and they won't know quite what it

13   means, and I'll take out the "however" because we'll just say,

14   "Facts contained in questions to which the witness has

15   assented, for instance, on cross-examination or evidence, if

16   you credit the witness's affirmative answer".

17        ATTORNEY DRESCHER:  Yeah.  I've got, I have two other

18   comments, Your Honor, one of which Mr. Turner just shared as

19   well.  It doesn't matter whether it's on cross or on direct if

20   the question is leading.  I think, for instance, "on

21   cross-examination" sort of tilts the scales a little bit in

22   this --

23        THE COURT:  All right.  You aren't supposed to get

24   yes-or-no answers to your direct questions, but I suspect you

25   did, so that's fair enough.

1             ATTORNEY DRESCHER:  My only other comment, and I

2      concede that this is very subjective, is "facts contained in

3      questions to which the witness has assented".

4             THE COURT:  Right.

5             ATTORNEY DRESCHER:  The verb "assented" --

6             THE COURT:  Would you rather it say, "Said yes"?

7             ATTORNEY DRESCHER:  To which facts contained in

8      questions -- to which the witness -- the sentence feels vague.

9      It feels like you can sort of -- to which, you know, which the

10     witness has adopted in his or her answer perhaps is the -- I

11     guess "assented" is fine.

12            THE COURT:  All right.  There we go.  I'll, I'll add

13     the Matson gloss to these instructions.  I know I'm going to

14     hear about it from the next AUSA that goes through these.

15            ATTORNEY DRESCHER:  We're all going to hear about it,

16     Your Honor.

17            THE COURT:  Yeah, I know who's going to raise it too.

18            ATTORNEY MATSON:  I'm going to share it with my

19     defense bar so that I'm not the lone voice.

20            THE COURT:  Oh, please.  All right.

21            ATTORNEY DRESCHER:  Mr. Matson will get credit in

22     this case for this and other things, I'm sure.

23            THE COURT:  All right.  Anything else on 7?

24            ATTORNEY DRESCHER:  I do not have anything.

25            THE COURT:  And 8 is just the finishing up something.

1    There's 8, and on 9 I've again struck the reference to

2    stipulations because we didn't have any.  Credibility of the

3    Witnesses and Interest in Outcome, Page 9, 10, any

4    improvements?

5              ATTORNEY MATSON:  No, Judge.

6              ATTORNEY DRESCHER:  No.

7              THE COURT:  I have a question mark by, under Law

8    Enforcement Witnesses, the second paragraph, "Proper for the

9    defense to try to attack the credibility of a law enforcement

10   witness".  I didn't think that happened, so I'm not sure that

11   it really belongs in the case.

12             ATTORNEY MATSON:  I agree, Judge.

13             THE COURT:  Okay.  I'll take it out.

14             ATTORNEY DRESCHER:  Which --

15             THE COURT:  It's the, "At the same time, it's proper

16   for the defense to try to" --

17             ATTORNEY DRESCHER:  The second paragraph?

18             THE COURT:  Yeah.  I mean, that kind of comes from

19   the standard book, but I've never seen anybody actually try and

20   do it, and it certainly didn't happen in this case.  It was

21   pretty much a lovefest with the law enforcement officers.

22             ATTORNEY MATSON:  That is not, not what I want to

23   hear, Judge.

24             THE COURT:  Well, I mean --

25             ATTORNEY MATSON:  Typically, just typically as a

1  defense lawyer.

2          THE COURT:  Their testimony was not hotly contested.

3  All right.  And I'll leave the last -- what I'll do is roll the

4  final paragraph into the one above, "It is your decision after

5  reviewing all the evidence".  List of Informants, we certainly

6  had them, but I don't remember anybody getting paid.  Do we

7  have a guy that got $150 per deal?  I didn't think so.

8          ATTORNEY DRESCHER:  I don't, I don't think so either.

9  They were all, I mean, they were all doing it for purposes of

10 consideration --

11         THE COURT:  Yeah, that's what I thought.

12         ATTORNEY DRESCHER:  -- like, prosecutorial or

13 sentencing consideration.

14         THE COURT:  Even the controlled, the controlled buy

15 -- it seems so long ago when we started this case.  The

16 controlled buy guy testified at the beginning, right?

17         ATTORNEY TURNER:  Yes, I do remember that now.  I

18 remember checking with law enforcement.  He was only working

19 for consideration on his charges, not monetary.

20         THE COURT:  That's how I remembered it too.  Is that

21 how you remember it, Chandler?

22         ATTORNEY MATSON:  I did not remember ever seeing him

23 being paid.

24         THE COURT:  Yeah.  So I'll take it out.  I'll just

25 call him an informant.  Okay.  Now we kind of move into the

1   heart of the cross-examination.  Witnesses Who Have Received

2   Immunity or Other Benefits, I've just added one, two, three,

3   four, five, eight lines down, "accomplices that have pleaded

4   guilty to crimes arising out of the same events", because there

5   were multiple crimes in some cases, and then, "You should hear

6   from the government on the additional proposed language

7   proposed by the defense".

8           ATTORNEY DRESCHER:  I'm, I'm sorry, Judge.  If I

9   could just try and get -- I'm just trying to get --

10          THE COURT:  Yeah, yeah.  Do you have, do you have

11  Chandler's version?

12          ATTORNEY DRESCHER:  I have Mr. Matson's version, but

13  I'm also tracking back with what I believe was the Court's

14  Draft 2 where I have some handwritten notes that I want to

15  share.

16          THE COURT:  Okay.

17          ATTORNEY DRESCHER:  But I just want to make sure I'm

18  not --

19          THE COURT:  Take your time.

20          ATTORNEY DRESCHER:  I'm struggling with the

21  pagination between Mr. Matson's submission and --

22          THE COURT:  Yeah, yeah.

23          ATTORNEY DRESCHER:  Okay.

24          THE COURT:  So I'm looking at Mr. Matson's 12 and 13.

25  The header is Testimony of Witnesses Who Have Received

1    Immunity, and he has quite a long addition proposed.

2    ATTORNEY DRESCHER:  My initial, my principal reaction

3    to Mr. Matson's requested addition is that it is largely

4    redundant with the paragraph that was in Draft 2, and I'm not

5    sure that it adds value or clarity to the charge, and, on that

6    ground, I would recommend not including it.

7    THE COURT:  The part that's new is the sort of

8    greater care or caution.  The first, it's really the first

9    paragraph.

10    ATTORNEY DRESCHER:  I mean, I think what we were just

11    reviewing covers that.  We don't have any paid informants.  We

12    certainly have folks who have testified pursuant to agreements

13    that immunize them from the use of their testimony or their

14    testimony being used against them, but I think that is, but I

15    think that is covered in the first paragraph, the initial

16    paragraph, of Draft 2.

17    THE COURT:  A little sparsely.  How about the

18    substance?  What I'm thinking is is including the first

19    proposed paragraph.

20    ATTORNEY DRESCHER:  "Testimony of a person who

21    provides evidence against the defendant as an informer for

22    immunity from punishment."  Well, there --

23    THE COURT:  Well, we have to fiddle with it.  There

24    is no question of pay or for -- oh, it's not -- nobody is doing

25    this for immunity from punishment.  We can get there.  Or

1  personal vindication or for -- consideration at sentencing,

2  that's really what it is, right?

3          ATTORNEY DRESCHER:  But I, again, I'm sorry I'm

4  beating a horse that's partially dead here.  The paragraph that

5  is already contained in Draft 2 --

6          THE COURT:  Yeah.

7          ATTORNEY DRESCHER:  -- "You have heard testimony from

8  witnesses who have received immunity or who have received some

9  other benefit by testifying in this case or cooperating in some

10  other way with the prosecution", I think that's what we were

11  struggling with trying to articulate in the second paragraph

12  that Mr. Matson has posited, which I think is an example of why

13  I don't think there is, the charge is, is improved in any way

14  by the addition of the requested language.  The paragraph

15  that's in there is tried and true.  I think it covers

16  Mr. Matson's concerns.

17          THE COURT:  All right.  Mr. Matson, you've been

18  patient.

19          ATTORNEY MATSON:  Thank you, Judge.  The main thing

20  that I'm trying to convey is that more, greater care and

21  caution with regard to such witnesses should be given than a

22  witness, like, who doesn't have a cooperation agreement or who

23  has no stake.  I mean, having a stake in the outcome of

24  litigation is where all of these instructions have sort of

25  evolved from, but that's not really what we're talking about.

1    We're talking about a cooperation agreement.

2        It's, the jury's going to listen to both sides about

3    truth-telling and listen to me about, Well, you're hoping for a

4    better sentence, but that they need to measure that, and they

5    need to give greater consideration and scrutiny to those types

6    of witnesses, which I don't think is in the original version.

7    I really wanted that, Your Honor to instruct them that they

8    should give greater care in evaluating a witness's testimony

9    where there is such an agreement.  That's the important

10   concept.

11           THE COURT:  Yeah, yeah.

12           ATTORNEY DRESCHER:  Not only in the paragraph that

13   we're talking about in the Testimony of Witnesses section

14   that's already in Draft 2, but a couple of pages earlier where

15   the Draft 2's charge relating to Interest in Outcome I think,

16   again, already covers what Mr. Matson -- it is a completely

17   fair concern.  I think it's already in the charge.

18           THE COURT:  Interest in outcome is kind of a

19   different problem, right?  None of the witnesses have an

20   interest in the outcome of Mr. Troupe's case.  They have an

21   interest in the outcome of their case.  That -- we can almost

22   take Interest in Outcome out, right?  It's almost a civil

23   standard, right, are you going to get something out of this?

24           ATTORNEY DRESCHER:  Well, that's fair.

25           THE COURT:  Want to take that one out and kind of

1    focus on the interests that you --

2            ATTORNEY DRESCHER:  That's fair, because I don't

3    think there is a --

4            ATTORNEY MATSON:  I would, Judge, and that's --

5            THE COURT:  You would?  Okay.  So I'll take Interest

6    in Outcome out.  I've always kind of wondered what it means

7    anyway.  You know, I mean, it's in the standard book.  And

8    let's find a neutral way to make the point that people that are

9    testifying for sentencing consideration should be examined

10   carefully.

11           ATTORNEY MATSON:  And I'm sorry.  I did leave in

12   financially.  I was not -- yesterday, when I was thinking about

13   it, I couldn't recall or was not definitive about whether

14   Mr. Krigger had been paid.  I thought there was a possibility

15   that he may have been paid, but that's out --

16           THE COURT:  Yeah.

17           ATTORNEY MATSON:  -- because he was not paid.

18           THE COURT:  Right, right, yeah.  I think we all agree

19   about that.

20           ATTORNEY DRESCHER:  I guess my big beef having -- and

21   I appreciate the removing Interest in Outcome.  The idea that

22   that, the idea of "with greater care" is a use of language that

23   I think puts the thumb on the scales inappropriately.  All

24   testimony needs to be considered with care in light of various

25   factors, and those factors are articulated in the first

1    paragraph here, which is, which was already part of Draft 2,

2    which already reads, "In evaluating the testimony of such a

3    witness, you may consider the extent to which or whether their

4    testimony may have been influenced by any of these factors".

5        I think the fact that the Court is going to include this

6    instruction is sufficient to draw the jury's attention to the

7    potential issues with these witnesses without the Court's

8    authority telling the jury that they need to treat these

9    witnesses with, with greater care than other witnesses.

10       THE COURT:  How about this?  After, "in evaluating

11   the testimony of such a witness", and before, "additionally",

12   "You may consider whether their testimony is influenced by a

13   desire for consideration at sentencing or in some similar way"?

14   Because that's really kind of what the whole issue throughout

15   this case has been.

16       ATTORNEY DRESCHER:  I can live with that.  I think

17   that's sort of a restatement of the second sentence that's in

18   there right now.

19       THE COURT:  Yeah.

20       ATTORNEY DRESCHER:  But --

21       THE COURT:  I think, Mr. Matson, does that capture

22   what you're after?  I know you would like more, but that's why

23   we have closing statements.

24       ATTORNEY MATSON:  No.  Understood, Judge.  I,

25   obviously, I want what I've submitted, and I understand there's

 1    going to be a change.

 2              THE COURT:  Yeah, yeah.

 3              ATTORNEY MATSON:  If there is going to be a change,

 4    and it sounds like there will be, I think that the greater care

 5    and caution with regard to somebody who does have a motivation,

 6    right, and an inducement and a cooperation and a 5K letter, I

 7    do think it's appropriate for Your Honor to instruct them that

 8    they should give greater caution and care when considering that

 9    person's testimony.

10              THE COURT:  I'm a neutral guy.  I'll let you guys

11    argue it, but I'll at least flag the issue that that's what

12    you've been talking about appropriately and consistently.

13              ATTORNEY MATSON:  Understood.

14              THE COURT:  I think that covers up to --

15              ATTORNEY MATSON:  Your Honor?

16              THE COURT:  Yeah.

17              ATTORNEY MATSON:  Also, on that same page, "drug or

18    alcohol consumption".

19              THE COURT:  Yeah.  Everybody's sober now --

20              ATTORNEY MATSON:  Now.

21              THE COURT:  -- but wasn't then.

22              ATTORNEY MATSON:  Right.

23              THE COURT:  So what would you like to do?  Mr.

24    Drescher?

25              ATTORNEY DRESCHER:  I think the instruction is a

1    little weird because it's not specific as to time.  "The

2    testimony of a drug or alcohol abuser", an undefined term, and

3    it's not put in a temporal context, as Your Honor pointed out,

4    "must be examined with greater care".  I think, again, this is

5    something that Mr. Matson can cover in closing.  If he wants to

6    challenge the credibility of a witness's perceptions or

7    influence by virtue of the witness's drug use, I think that is

8    appropriate argument, but I don't think -- I think it's, I

9    think, especially as worded right here, I think it's confusing

10   and not necessary.

11          THE COURT:  All right.  I'll let you argue it.

12   There's no evidence in about it, and, for example, nobody said,

13   It's all hazy because I was so high.  It's kind of a

14   common-sense surmise that their observations might have been

15   compromised by smoking crack, but nobody has said so, and

16   certainly no physician has said so.  I don't think you're going

17   to hear an objection if you argue it, and I'd probably allow it

18   anyway because there's some common sense to it, but I don't

19   think I kind of need to wade in and open it up.

20          Admissions, that takes me to what I call Matson 14,

21   looking, working from his draft.  I had a question about

22   Admissions by the Defendant.  I don't think there, there was a

23   recorded -- he didn't give an interview or a statement, right?

24          ATTORNEY DRESCHER:  No statement to law enforcement,

25   no.  I mean, we have his voice on a call saying he's very

1   dangerous and he's talking about drug proceeds.  There are,

2   but, to law enforcement, no, there are no --

3           THE COURT:  Right.  And you don't need an instruction

4   about his, his admissions to laypeople?  This is really just

5   directed at a law enforcement.  Either of you want this one in,

6   Admissions by the Defendant?

7           ATTORNEY DRESCHER:  I don't think we need it.

8           ATTORNEY MATSON:  No, Judge.

9           THE COURT:  Yeah, it's out.  Thanks.  Defendant not

10  Testifying, you'd like to have that?

11          ATTORNEY MATSON:  I'd like that addition, Judge.

12          THE COURT:  Yeah, yeah.  No.  You're totally entitled

13  to it.  It's no problem.

14          ATTORNEY MATSON:  And those additions, Judge?

15          THE COURT:  Yeah.  What I --

16          ATTORNEY MATSON:  I'd just like to instruct the jury

17  that, Don't even think about it, right?  That's my --

18          THE COURT:  I just changed the last sentence to,

19  really for phrasing, "You may not consider the fact that

20  Mr. Troupe did not testify in any way during your

21  deliberations".

22          ATTORNEY MATSON:  Thank you, Judge.  Yeah.

23          THE COURT:  That work for the government?

24          ATTORNEY DRESCHER:  Your Honor's changed?

25          THE COURT:  The last sentence, I just rewrote it,

1    "You may not consider", instead of "this", whatever that is,

2    "you may not" -- you know a tenth grade English teacher would

3    have put a red pencil around that -- "You may not consider the

4    fact that Mr. Troupe did not testify in any way during your

5    deliberations".

6              ATTORNEY DRESCHER:  I'm, we're fine with that.

7              THE COURT:  Yeah.  And, similarly, I've added to what

8    is Matson 15 to the final paragraph, "You are not to consider

9    in any manner the fact that the defendant did not testify or

10   call any witnesses himself.  Do not even discuss this fact in

11   your deliberations".

12             ATTORNEY MATSON:  Okay.  Thank you, Judge.

13             THE COURT:  That work?

14             ATTORNEY MATSON:  Yes.

15             THE COURT:  Yeah.

16             ATTORNEY DRESCHER:  And, just for my own clarity,

17   Mr. Matson's request in the red on Matson 14, it will not

18   appear in light of Your Honor's edits that you've just

19   articulated?

20             THE COURT:  It will.

21             ATTORNEY DRESCHER:  Oh, okay.

22             THE COURT:  I just rewrote the, just to get rid of

23   the, the kind of dangling -- yeah.

24             ATTORNEY DRESCHER:  Yeah, that's fine.

25             ATTORNEY MATSON:  Dangling participle, Judge?

1          THE COURT:  I didn't want to say the wrong word for

2     the record.

3          ATTORNEY MATSON:  I don't know what a dangling

4     participle is, so I was hoping you would give me some context.

5          THE COURT:  Yeah, yeah, all right.  Bias, Prejudice,

6     and Inequality, normal.  Any, any changes before we dive into

7     the instructions on the substantive law?

8          ATTORNEY MATSON:  No, Judge.

9          THE COURT:  All right.  So the first, the conspiracy

10     charge, the defense did not have any changes to propose all the

11     way through the entire discussion of Count One, and my first

12     comment comes at Matson 25.  How about from the government?

13          ATTORNEY DRESCHER:  It's a little bit of a nit.

14          THE COURT:  Yeah.

15          ATTORNEY DRESCHER:  On, on Matson 18 --

16          THE COURT:  Yeah.

17          ATTORNEY DRESCHER:  -- under the essential elements

18     of the four charges, "Count One charges Mr. Troupe with

19     conspiring to distribute 500 grams or more of cocaine base, a

20     Schedule II controlled substance", in a colloquial way, that's

21     accurate.

22          THE COURT:  Yeah, yeah, you're right.

23          ATTORNEY DRESCHER:  The allegation is that he

24     conspired to distribute cocaine base and that the conspiracy

25     involved the distribution of a material or substance containing

1    five, you know, five, blah, blah, blah of cocaine.  Our, our

2    quantity allegation is general to cocaine because, under DOJ

3    policies, we're not charging the crack mandatory minimums;

4    we're charging the harder to prove, the higher quantities for

5    the powder.  As a practical matter, we've only talked about

6    cocaine base, and so it's probably not that big a deal, but,

7    technically, that's not what the charge is with the conspiracy.

8            THE COURT:  Yeah.  No.  I take your point.  It's a

9    good one.  So it should read, "Count One charges Mr. Troupe

10   with conspiring to distribute cocaine base, and the offense is

11   alleged to concern 500 grams or more of cocaine" --

12           ATTORNEY DRESCHER:  Yeah.

13           THE COURT:  -- "a Schedule II controlled substance".

14   Thank you.  No.  That's a, that's not unimportant.

15       All right.  I'm good up to, looking at Matson 24,

16   knowledge that the drugs were controlled substances, and I've

17   got a question there.  Anything up to that point?

18           ATTORNEY DRESCHER:  Not from the government.

19           ATTORNEY MATSON:  No, Judge.

20           THE COURT:  My question was, Who has to know the

21   objective of the conspiracy?  We've written it up that the

22   defendant knew that the objective of the conspiracy was to

23   distribute controlled substances and, in particular, the

24   controlled substance of cocaine base.  In a law school setting,

25   I suppose only one of the alleged conspirators had to know the

1    whole thing, but I'm inclined to leave it as it is, unless

2    someone's troubled by it.

3           ATTORNEY DRESCHER:  I was not troubled by the draft.

4           THE COURT:  Right.  It makes it harder for the

5    government because they have to prove a particular person, you

6    know, the defendant, not, not somebody else.

7           ATTORNEY DRESCHER:  Well, I mean, I think, in this

8    context, we have to prove that the defendant was aware of the

9    objective of the conspiracy.

10          THE COURT:  Yeah, right.

11          ATTORNEY DRESCHER:  But it didn't strike me as

12   unreasonable.

13          THE COURT:  Good.  Fine?

14          ATTORNEY MATSON:  That's fine, Judge.

15          THE COURT:  I was just worried about it.  And that

16   takes us all the way through, unless there are more.

17          ATTORNEY DRESCHER:  On the quantity?

18          THE COURT:  Yeah.   Yes, I see it, of cocaine.

19          ATTORNEY DRESCHER:  In addition, the wording of the

20   indictment, I think it probably makes sense to track the

21   wording of the indictment --

22          THE COURT:  Okay.

23          ATTORNEY DRESCHER:  -- which also alleges that the

24   conspiracy involved a quantity of 500 grams or more of a

25   mixture and substance containing a detectable amount of

1    cocaine, which is how it's worded --

2              THE COURT:  Sure.

3              ATTORNEY DRESCHER:  -- in the charging document.

4              THE COURT:  Yeah.  "The conspiracy involved a

5    quantity of 500 grams or more" --

6              ATTORNEY DRESCHER:  "Of a mixture and substance

7    containing a detectable amount of cocaine", and strike "base".

8              THE COURT:  A detectable amount of cocaine, right?

9              ATTORNEY DRESCHER:  Right.

10             THE COURT:  Period.

11             ATTORNEY DRESCHER:  Just cocaine.

12             THE COURT:  Yeah.  Picking up, Mike, on your, your

13   accurate comment about unanimity, on the Essential Elements of

14   the Charge of Count Two, I've changed it a little bit to say,

15   "Count Two of the third superseding indictment charges

16   Mr. Troupe with knowingly using or carrying a firearm during

17   and in relation to the conspiracy alleged in Count One or, in

18   the alternative, knowingly possessing", in the sense that each

19   one of those, then you don't have to prove any pair.  I think

20   the statutory language is using and carrying, right?

21             ATTORNEY DRESCHER:  Right.

22             THE COURT:  But that's sort of confusing.

23             ATTORNEY DRESCHER:  Right.  I believe it's provable

24   in the disjunctive.  We don't have to prove them both.

25             THE COURT:  Yeah.

1          ATTORNEY DRESCHER:  And maybe I got confused by Your

2    Honor's language a moment ago when you said that Mr. Troupe had

3    to knowingly, you know, use or carry, again, because it's a

4    Section 2 theory, aiding and abetting, it's not --

5          THE COURT:  Oh, right, right, right.

6          ATTORNEY DRESCHER:  "The defendant aided and abetted

7    another person who was a member of the conspiracy charged in

8    Count One and knowingly used or carried or knowingly

9    possessed."  I think it's okay as written.

10          THE COURT:  All right.  Well, it does track the, the

11    -- you want to just leave the "ands" in place because that's

12    what it says?

13          ATTORNEY DRESCHER:  In the third essential element,

14    is that where?

15          THE COURT:  Yeah.  The Essential Elements of the

16    Charge of Count Two, the very beginning, the introductory

17    remark.

18          ATTORNEY DRESCHER:  Yeah.  I'm sorry.  I was ahead of

19    Your Honor.  I'm not tracking.  Okay.  Thank you.  "Knowingly

20    using and carrying a firearm" --

21          THE COURT:  Maybe I'm making it too complicated.

22    I'll just follow the use of "and" in the indictment, because

23    that tracks the statute, all of which uses "and", right?  And

24    we can get into the alternative later on.

25          ATTORNEY DRESCHER:  Okay.

1          THE COURT:  Yeah.  And Mr. Matson has added the date,

2    "On or about February 2, 2022".

3          ATTORNEY DRESCHER:  That's fair.

4          THE COURT:  That's fine.  All right.  So now we're

5    into the elements.  I left that alone.  The only theory on

6    Count Two is the aiding and abetting theory, right?

7          ATTORNEY DRESCHER:  That's correct.

8          THE COURT:  Okay.  So Matson 27, anything to change?

9          ATTORNEY MATSON:  No, Judge.

10         THE COURT:  And now that takes us to 28.  I'm a

11   little troubled about tying in the one, two, three, fourth

12   paragraph, the one at the bottom that starts, "If you found the

13   defendant actively participated in the conspiracy charge in

14   Count One".

15        Well, what if they acquit on Count One?  Where does that

16   leave us all, right?  Because they still have to return a

17   verdict on Count Two.  I had thought about taking out that

18   entire paragraph and dealing with the issue later on, because

19   this kind of makes a conviction on Count Two contingent on

20   Count One.  I think this was language which you had supplied

21   and I added in, but, when I looked at it --

22         ATTORNEY DRESCHER:  So Your Honor is suggesting

23   striking the entire paragraph that starts, "If you have found"?

24         THE COURT:  Yeah, all the way down to the proposed

25   date, you know, February 2, 2022.  We can take up separately

1   Mr. Matson's suggestion about advance knowledge.  That's a
2   different issue.
3       We can talk about it later on.  Commission of the
4   underlying crime is the first element of the aiding and
5   abetting charge.  This paragraph is really more about what it
6   means to aid and abet and less about --
7           ATTORNEY DRESCHER:  I'm, it is about what it means to
8   aid and abet, and, of course, that's our theory in Count Two.
9   It's my understanding, with a couple of tweaks I was prepared
10  to propose, that this paragraph is basically straight out of
11  *Rosemond*.  It's an accurate statement of the law --
12          THE COURT:  Yeah.
13          ATTORNEY DRESCHER:  -- and, as it pertains to aiding
14  and abetting the 924(c), and if it's removed --
15          THE COURT:  Look ahead to Page 31.  It is, it doesn't
16  disappear.  It's just a question of when we talk about it.
17          ATTORNEY DRESCHER:  31 on Matson?
18          THE COURT:  Matson.
19          ATTORNEY DRESCHER:  But 31 is a discussion of the
20  conduct of the principal.
21          THE COURT:  Yeah.
22          ATTORNEY DRESCHER:  And, and that is, obviously, it's
23  related to whether it was, whether that conduct was aided and
24  abetted, but I think you need, we need to prove, in order to
25  comply with *Rosemond*, that the defendant actively participated

1  in the crime by doing some act to help it succeed, and then

2  *Rosemond* goes on to say that one way to do that is if the

3  defendant participated in the conspiracy.  I'm -- this is about

4  knowing association.  I'm confusing my aiding and abetting.  So

5  the paragraph beginning, "If you have found that the defendant

6  actively participated" --

7          THE COURT:  Yeah.

8          ATTORNEY DRESCHER:  -- that is about how to prove the

9  defendant's knowing association --

10          THE COURT:  Right.

11          ATTORNEY DRESCHER:  -- in the context of a 924(c).

12          THE COURT:  All right.

13          ATTORNEY DRESCHER:  I believe that is lifted pretty

14  closely, hews quite closely to *Rosemond* with the caveat that it

15  should say, "knew in advance", as Mr. Matson suggested.  We

16  agree with that.

17          THE COURT:  Okay.  You're happy with it?

18          ATTORNEY DRESCHER:  What I would propose is it be

19  left in and that, in between one, two, three, four, fourth line

20  down where it says, "beyond a reasonable doubt that the

21  defendant knew", add the words "in advance" after "knew", "in

22  advance that one or more of the participants in the conspiracy

23  charged", and then for syntactical consistency it should be "or

24  possessing", would be, "using or carrying a firearm during and

25  in relation or possessing a firearm in furtherance".

1           THE COURT:  Yeah, yeah.

2           ATTORNEY DRESCHER:  I think it would -- I think that

3    paragraph is -- and I appreciate Your Honor's point that, if he

4    does not, if he is not convicted on Count One, then, then this

5    paragraph would not apply, but I think, I think the most --

6    and, I mean, I also appreciate that it's relatively confusing,

7    aiding and abetting the 924(c) as *Rosemond* describes it, but I

8    think it's important that we keep that language in to abide by

9    *Rosemond*.

10          THE COURT:  Okay.

11          ATTORNEY MATSON:  And we are talking about the

12   language directly above my --

13          THE COURT:  Yes.

14          ATTORNEY MATSON:  Okay.  Everything is confusing

15   about these things.  I was not confused by that particular

16   portion of it, though.  I think it was --

17          THE COURT:  All right.  I'll leave it alone.  In

18   other words, the universe of drug crimes that you seek to prove

19   is only the drug conspiracy?

20          ATTORNEY DRESCHER:  Right.

21          THE COURT:  So, were he to be acquitted on Count One,

22   logically, he'd have to be acquitted on this count as well.

23   It's hard to imagine how it could be otherwise, right?

24          ATTORNEY DRESCHER:  Except, yes, yes.

25          THE COURT:  That's a --

1    ATTORNEY DRESCHER:  Yes, it's hard to imagine.  I
2    think I could come up to the task, but, yes, I agree, it's hard
3    to imagine.
4        THE COURT:  We can cross that bridge if we come to
5    it.  All right.  So how about Matson's further development of
6    this theme of advance knowledge, any problem with that?
7        ATTORNEY MATSON:  That is a quote, just for the
8    record.  That's not, that's from Justice Kagan.  That's not
9    Chandler Matson.  That's the language from *Rosemond*.
10       THE COURT:  Right.  I was giving you credit for moral
11   choice.  I thought that was pretty impressive.
12       ATTORNEY MATSON:  I liked it, but not by me.
13       ATTORNEY DRESCHER:  I agree that it is, appears to be
14   an accurate statement of --
15       THE COURT:  Of *Rosemond*?
16       ATTORNEY DRESCHER:  -- of *Rosemond*.
17       THE COURT:  So we should leave it in?
18       ATTORNEY DRESCHER:  I think that's fair.
19       THE COURT:  Okay, thanks.  And then anything further
20   on -- I'll take further and the nature of the underlying
21   offense, but that is all, all good.  Anything further on Page
22   29?
23       ATTORNEY MATSON:  No, Judge.
24       ATTORNEY DRESCHER:  No, no.  We're okay with that.
25       THE COURT:  And then on Page 30, wrapping up the

1    discussion of aiding and abetting, Chandler's added, "Did the

2    defendant have advance knowledge and an opportunity to withdraw

3    or participate with his codefendant in committing the offense

4    with a firearm?"

5              ATTORNEY DRESCHER:  I think that's fair.

6              THE COURT:  Okay, all right.  For some reason, I

7    found the Commission of the Underlying Crime hard.  When we get

8    there, I'll tell you why.  What did you propose deleting here?

9    Oh, it's the same.  Did I repeat it twice?  Yeah, I get it.  So

10   I'm looking at the First Element: Commission of the Underlying

11   Crime.  "The first element the government must prove beyond a

12   reasonable doubt" -- the instruction is that the conspiracy to

13   distribute cocaine base is a drug trafficking crime.  All fine

14   on the first element?

15             ATTORNEY MATSON:  Yes, Judge.

16             THE COURT:  Second?  This is the underlying crime,

17   knowingly used or carried or knowingly possessed.

18             ATTORNEY DRESCHER:  I'm sorry, Your Honor.  I'm

19   struggling to follow, and I don't -- I feel like I'm the slow

20   --

21             THE COURT:  No rush.  Take your time.

22             ATTORNEY MATSON:  Yeah.  So, Judge, I think the

23   confusion is that deletion.  The problem was I took a PDF,

24   converted it to Word, redlined it back to the PDF, and it

25   created this wonky thing.

1      THE COURT:  Yeah.

2      ATTORNEY MATSON:  I think that deletion is back in.

3      ATTORNEY TURNER:  I get it now.

4      ATTORNEY MATSON:  It's not really a deletion.

5      THE COURT:  Oh, it's the end of the previous

6  discussion?

7      ATTORNEY TURNER:  I think that helped ameliorate some

8  of the confusion.

9      ATTORNEY MATSON:  Make sense?

10     THE COURT:  Yeah, yeah.

11     ATTORNEY MATSON:  I did not see that.  I would have

12  taken it out if I noticed it last night --

13     THE COURT:  Right, all right.

14     ATTORNEY MATSON:  -- or was thinking clearly at that

15  point in my night.

16     ATTORNEY TURNER:  I understand it better.

17     ATTORNEY DRESCHER:  So the First Element: Commission

18  of the Underlying Crime --

19     THE COURT:  All good.

20     ATTORNEY DRESCHER:  -- I'm okay with that.

21     THE COURT:  Next one, Knowing Use of the Firearm?

22     ATTORNEY DRESCHER:  I think I would ask that, in the

23  second line rather than at the beginning where it is, rather

24  than reference to "the person", "a person", which would be

25  consistent with how we talked about it.

1    THE COURT:  Okay.  Yeah, that's an improvement.

2    Thank you.  Now, that takes us to 32.

3    ATTORNEY DRESCHER:  And okay.  32?

4    THE COURT:  And now that's where we talk about use,

5    carry, and possess.

6    ATTORNEY DRESCHER:  Right.

7    THE COURT:  What I did was bold each of the verbs so

8    that they could kind of follow.

9    ATTORNEY DRESCHER:  Right.

10    THE COURT:  Any changes to those two pages?

11    ATTORNEY DRESCHER:  In my email to the Court about at

12    1:42, I don't know if Your Honor --

13    THE COURT:  Yeah, I've got it right here.

14    ATTORNEY DRESCHER:  I believe, after the discussion

15    of using, carrying, using, or possessing --

16    THE COURT:  Right.

17    ATTORNEY DRESCHER:  -- it would be prudent, if not

18    here, somewhere in this count to add the proposed language

19    regarding we don't have to prove each, used, carried, or

20    possessed, but we have to prove one of them unanimously, which

21    is the, the language, the first set of language that I emailed.

22    THE COURT:  Yes.  So how about if we add that

23    paragraph, call it "Unanimity of Your Decision"?

24    ATTORNEY DRESCHER:  Okay.

25    THE COURT:  I mean --

1    ATTORNEY DRESCHER:  Theory is a little --

2    THE COURT:  A little wishy-washy.

3    ATTORNEY DRESCHER:  -- a little lofty.  Unanimity of

4    decision.

5    THE COURT:  And I could put it in in place of the

6    proposed language from Chandler, "You must find that the above

7    elements are met".  It's a whole 'nother topic.

8    ATTORNEY DRESCHER:  Yeah.

9    THE COURT:  Unanimity of your Decision, and then I'll

10   -- Chandler, do you have any objection to these two paragraphs?

11   ATTORNEY MATSON:  In the email from Attorney

12   Drescher?

13   THE COURT:  Yeah.

14   ATTORNEY MATSON:  No.  I thought that was useful.

15   THE COURT:  So how about if I strike your three

16   sentences there, "You must find the above elements are met",

17   and instead put the *Fuller* decision, discussion in its own,

18   under its own topic under Unanimity of Your Decision?

19   ATTORNEY MATSON:  Okay.  And include my additional

20   language there?  I just want the jury to be reminded -- when I

21   first read the instructions, and I'm trying to think like a

22   juror who is just trying to struggle to understand things and

23   get the information --

24   THE COURT:  Yeah, yeah.

25   ATTORNEY MATSON:  -- it sounded as though someone

1    could be guilty of a 924(c) if they contributed in any way to

2    the conspiracy and then the conspiracy went off and any member

3    of it used a firearm and that's enough, and I just really want

4    the jury to understand that, you know, while you're in, it's

5    enough that you participated and in furtherance of the

6    conspiracy, you have to have knowledge of that firearm to be

7    guilty of the 924(c).

8         So I just wanted that repeated at the end, because it does

9    seem like, if the jury finds -- on first read it seemed like,

10   if the jury found that Eric Raymond was in a drug conspiracy

11   and he possessed a firearm, well, that's enough to hook

12   Dominique Troupe no matter what, and it's not.  He has to have

13   that knowledge to have the intent to take part in an armed

14   offense, right?  So I wanted it repeated, Judge, at the end

15   because I think it's important to remind the jury that it's not

16   enough just to prove that Eric Raymond did this, right?  If I'm

17   rambling, I apologize.  I may have been.

18         ATTORNEY DRESCHER:  I don't disagree with the

19   requirement to prove knowledge.  I think there is plenty of

20   extra language with regard to the knowledge element and the,

21   and the need for it to be in advance that we've, that Your

22   Honor has, we've all agreed should be added, that language

23   that's tracking *Rosemond* a few pages earlier.

24         THE COURT:  Yeah.  I mean, I think that's what we've

25   just finished saying, right?

1          ATTORNEY MATSON:  Sure.  If, if you read the first
2     and second element, though, Judge, just right through --
3          THE COURT:  Yeah.
4          ATTORNEY MATSON:  -- then you start to lose a little
5     bit of that intent and knowledge.  It takes the focus off of
6     the intent and knowledge that we had emphasized up front, and I
7     just, again, want it to be in conclusion one to say, You have
8     to find these two elements, that's true, and you also have to
9     find intent based upon knowledge.  That's what they need to
10    find, right?
11         THE COURT:  Yeah.
12         ATTORNEY DRESCHER:  And I think that's in there and
13    circling back to it at this point in the charge is, makes it
14    even more confusing.
15         THE COURT:  Well, look, let's do it this way:  Before
16    this language I'll insert Drescher Paragraph 1, Unanimity of
17    Your Decision, and then we can call this Summary: "You must
18    find the above elements are met to find the defendant guilty of
19    Count Two.  Further" -- well, the above elements include this
20    participation with full -- I'll, if you want to highlight it,
21    obviously, you could do it in your, in your argument.  I'll do
22    it, but I hate to kind of tell them the same thing again.
23         ATTORNEY MATSON:  No, I understand that, Judge.  I
24    just, I'm going to try and put this a different way, which is
25    to say, if you look at the first element that the government

1   must prove beyond a reasonable doubt that a person other than

2   the defendant committed a drug trafficking crime --

3           THE COURT:  Yes.

4           ATTORNEY MATSON:  -- for which he is charged.  So

5   that's it, right?  Eric Raymond confessed.  They've proven that

6   somebody other than the defendant committed a drug trafficking

7   crime.

8        The second element the government must prove is that the

9   person who committed it knowingly used a firearm, which is Eric

10  Raymond.  Well, he's confessed to that, and he's pled guilty to

11  it.  So, if you find then in that final sentence, "You must

12  find that the above elements are met to find the defendant

13  guilty of Count Two", it sounds like, Judge, we're saying, if

14  you simply find that Eric Raymond committed a drug conspiracy

15  violation and used a firearm, then you can find Dominique

16  Troupe guilty.  That's what it sounds like, Judge.

17          THE COURT:  Yeah, I see.  I get it.

18          ATTORNEY MATSON:  And I just want to make clear that

19  those two elements are important but you have to find intent

20  too.

21          THE COURT:  Yeah, yeah.  Mike, do we need another, a

22  more fully developed section --

23          ATTORNEY DRESCHER:  I don't think so.

24          THE COURT:  -- on intent?  Because where does, where

25  does the defendant's intent?  I see that we've exhausted the

1    possibilities of the, what do we call them, the perpetrator's

2    intent, but where does the aiding and abetting intent?

3              ATTORNEY DRESCHER:  It's on Matson 28 over to 29.

4              THE COURT:  Let me look.  Oh, I see what you mean.

5              ATTORNEY MATSON:  Judge, it is, but it makes it sound

6    like that there's two elements to the 924(c) against Dominique

7    Troupe, the first element, commission of the underlying crime;

8    second element, use of a firearm during commission of the

9    offense, and those instructions both relate to Eric Raymond's

10   activities.  It's a person other than the defendant.  And, if

11   the jury is saying, Well, I've got to decide two elements here,

12   the first element that Eric Raymond did it, the second element

13   that he did it, they're going to find Dominique Troupe

14   responsible because they found those two elements.

15             THE COURT:  All right.  Give me two secs.

16             ATTORNEY DRESCHER:  Your Honor, may I -- are you in

17   the --

18             THE COURT:  I've just about got something here for

19   you.  How about this:  "Summary - remember that the charge that

20   defendant Dominique Troupe aided and abetted another person in

21   carrying, using, or possessing a firearm in the commission of

22   the drug crime has two distinct aspects.  As I've said, the

23   government must prove that the defendant aided and abetted the

24   underlying crime with advance knowledge of the use, possession,

25   of the use or possession of the firearm.  Second and separately

1    you, must find that another person used, carried, or possessed

2    a firearm in furtherance of the drug offense".  That's what

3    you're trying to say?

4              ATTORNEY MATSON:  That is what I'm trying to say,

5    Judge.

6              ATTORNEY DRESCHER:  I think we're on the same page.

7    As Your Honor was drafting, I was chatting with Mr. Matson, and

8    maybe another way to come about it is to, is to say something

9    to the effect of, "If you have found that someone other than

10   the defendant has committed the underlying offense, then, as I

11   previously explained, your job is to determine whether the

12   defendant aided and abetted the commission of that offense"

13             THE COURT:  Yeah, that's more economical.  Do you

14   prefer that?

15             ATTORNEY MATSON:  It's not bad.  It's more

16   economical, but it leaves out, obviously, the important part

17   that I have which is the intent in advance.

18             THE COURT:  Yeah.  So let's, let's --

19             ATTORNEY DRESCHER:  As you previously instructed,

20   which focuses on all of it.

21             THE COURT:  Okay.  No.  Yours is an improvement.  Can

22   you read it to me again and we can add in the intent element,

23   the advance knowledge element?

24             ATTORNEY DRESCHER:  "If you have found that someone

25   has committed this underlying offense, then, as I previously

1    explained, you are to determine whether the defendant aided and

2    abetted the commission of the offense".  And then that would

3    circle them back.  If their deliberation goes to, Okay, Eric

4    Raymond definitely committed this offense, they would then

5    circle back to the language including the highlighted language

6    with the, that Mr. Matson has added from *Rosemond*.  If I

7    understood Mr. Matson's concern, he didn't want the jury to get

8    confused that --

9             THE COURT:  Yeah, yeah.

10            ATTORNEY DRESCHER:  -- Mr. Raymond's commission of

11   the offense was enough, and by, I think, adding that hook at

12   the end, we are reminding them they have to circle back to the

13   aiding and abetting instruction.

14            THE COURT:  So how about this:  "If you have found

15   that someone has committed this underlying offense, then, as I

16   previously explained, you must determine whether the defendant

17   aided and abetted this offense with advance knowledge of the

18   use or possession of a firearm"?

19            ATTORNEY MATSON:  That does it for me, Judge.

20            ATTORNEY DRESCHER:  I think "with advance knowledge"

21   is a little redundant, but I appreciate what you're trying to

22   accomplish.  I would, I would prefer to stop before the "with

23   advance knowledge" because it circles back to -- you're

24   pointing them back to consider all of that, and it seems like

25   you're emphasizing, you know, one of the two elements of the

1    aiding and abetting prong or the aiding and abetting theory.

2    You have to have the intent, but you also have participated.

3              THE COURT:  Well, "with advance knowledge of the use

4    or possession in the offense and participation" --

5              ATTORNEY DRESCHER:  With --

6              THE COURT:  -- "in its commission"?

7              ATTORNEY MATSON:  Or even -- I actually liked the way

8    Your Honor had it, but it just -- or even, you know, with the

9    intent that the armed, with the intent that the -- I like the

10   way Your Honor had it, but that is, that's an important

11   element, right?  I mean, intent is probably the most important

12   element under aiding and abetting.  That's the *Rosemond* case,

13   right?

14             THE COURT:  What do you think?  I mean, I don't want

15   to add too many things.

16             ATTORNEY DRESCHER:  I like it without the added with

17   the, it, stopping after, you know, considering whether aiding

18   and abetted, as I previously instructed, and you could leave it

19   there, and that would circle back to the charge that includes

20   all of the intent requirements.

21             THE COURT:  Right.  I get it logically, but I think

22   it's really what the case is about, right?

23             ATTORNEY DRESCHER:  Okay.

24             THE COURT:  Yeah.

25             ATTORNEY DRESCHER:  I understand.

1            THE COURT:  Good enough.  All right.  Thank you.  So

2    that will go in as Summary in place of the three lines that

3    Chandler had suggested.  Discharging the Weapon?

4            ATTORNEY DRESCHER:  I wonder if the summary should go

5    after Discharging the Weapon, or maybe -- I mean, it is a

6    separate, stand-alone sentencing factor.  I think it's fine

7    either way.

8            THE COURT:  I think it's fine before it.  It's kind

9    of its own little thing.

10           ATTORNEY DRESCHER:  Yeah, and it's in the verdict

11   form as well.

12           THE COURT:  I mean, it's sort of hard to understand

13   how the guy died if it wasn't discharged.

14           ATTORNEY DRESCHER:  Fair.

15           THE COURT:  All right.  Count Three, I struggled

16   with this one, too, but not for a while.  Any, any --

17   conspiracy is the same again.

18           ATTORNEY DRESCHER:  Yeah.

19           THE COURT:  The second element, robbery, I thank you

20   for the, your suggestions, Mike.  I've added them all about

21   personal property.

22           ATTORNEY DRESCHER:  I appreciate that.

23           THE COURT:  Yeah, that was a great improvement.  And

24   37.  I guess that's it.  That's a short one.

25           ATTORNEY DRESCHER:  I think we're okay on Count

1    Three.

2         THE COURT:  Yeah, yeah.  And then Count Six is, I

3    think, easy.

4         ATTORNEY DRESCHER:  I had a -- and I would love to

5    take credit for this myself.  It was the suggestion of our

6    colleague, Mr. Ophardt, who noticed that, as currently drafted

7    in Draft 2, it, there is redundancy with Count One.  Let me go

8    back to the Matson pagination.  On Matson 42, the two

9    paragraphs at the bottom of Matson 42 I believe are redundant

10   with the discussion of knowledge of controlled substance that

11   Your Honor will have already given them in Count One.

12        THE COURT:  Oh, in the sense I just pasted the whole

13   thing in all over again?

14        ATTORNEY DRESCHER:  And so the suggestion that I

15   received from my colleague, which I agree with and which I put

16   in an email I sent earlier today, replaces those two paragraphs

17   with the single paragraph in my email, "Your decision whether

18   the defendant knew the materials he distributed" --

19        THE COURT:  Yeah, yeah.

20        ATTORNEY DRESCHER:  Or should be whether he possessed

21   --

22        THE COURT:  Nice.

23        ATTORNEY DRESCHER:  -- not distributed, possessed.

24   Were controlled substances.  And then you circle -- then you

25   just reference that.  You don't have to read it over.

1          THE COURT:  Yeah, yeah.  So that takes out the two

2    paragraphs comprising almost all of Page 42?

3          ATTORNEY MATSON:  That's fine, Judge.

4          THE COURT:  That's fine?  So, as I haven't had the

5    nerve to call him face-to-face but, as I've learned another

6    defendant in another case called him, thank "Mr. Open-heart"

7    for me.  I think he called him that throughout the trial.  I'll

8    work up the courage to tell him to his face.

9          ATTORNEY DRESCHER:  With Your Honor's permission, we

10   could pass on --

11         THE COURT:  You could pass it on.  That's sort of the

12   cheap way out.  But, you know, you don't mention these things

13   to a light colonel casually.  All right.  That is Drescher

14   Paragraph 2.  I love it.  I'm sure I borrowed Paragraph 3 from

15   the preceding one, too, right?  I must have.  It's probably the

16   same point, because I think I just lifted the whole thing.

17         ATTORNEY DRESCHER:  I'm not sure, because I didn't, I

18   didn't catch it if you did, because Count One is the conspiracy

19   to distribute.

20         ATTORNEY TURNER:  It's not in there, because, in the

21   first count, I think we just defined distribution as the intent

22   to distribute, so I do believe this is new.

23         THE COURT:  Right.

24         ATTORNEY DRESCHER:  We have no problem with the

25   third, the intent to distribute element that's at Matson 43.

1          THE COURT:  Okay.  I'll leave it alone.  And then

2     "Knowingly" and "Intentionally", Variance, we're sort of into

3     the easygoing now.  Any problem?

4          Unanimous, oh, Unanimous Verdict, that's the point at

5     which we've got to kind of deal with, at some point, we have to

6     deal up front with the alternatives in the gun charge of

7     knowing or carrying or possessing.  Can't have six voting on

8     one and six on another.

9          ATTORNEY DRESCHER:  I think we covered that by the

10    addition of the Unanimity of Decision --

11         THE COURT:  Yeah, yeah.

12         ATTORNEY DRESCHER:  -- with Drescher Paragraph 1.

13         THE COURT:  We did.  Okay, yeah.

14         ATTORNEY DRESCHER:  And then my only suggestion is

15    I'm, and, if I didn't attach this before, I apologize.  In the

16    Unanimous Verdict Required section, the last sentence reads,

17    "This requirement of unanimity also applies to your decision

18    concerning the quantity of cocaine base alleged in Count One",

19    and then I would suggest adding "and whether the firearm was

20    discharged in Count Two".

21         THE COURT:  Oh, yeah, yeah.  It's not Count Three;

22    it's Count One.  And thank you.  Whether the firearm was

23    discharged in Count -- which count was it?

24         ATTORNEY DRESCHER:  Count Two.

25         THE COURT:  Two?  Note Taking, this has been a very

1    earnest, serious jury.  They've, you know, very kind of on it.

2    No, no, no chitchat.

3             ATTORNEY MATSON:  No.

4             THE COURT:  Chandler, anything -- oh, and I've got to

5    include -- where would you like me to place the language about

6    the defendant's detained status?

7             ATTORNEY MATSON:  It probably is most natural to put

8    it up top.  Maybe -- I shouldn't say up top.  In the first

9    half, maybe around where we address the defendant not taking

10   the stand.

11            THE COURT:  Oh, yeah.

12            ATTORNEY DRESCHER:  We agree.

13            THE COURT:  Good.  And I didn't mean to be short

14   about that issue.  It's just we take such pains to conceal it

15   from the jury that -- I, I know it came in appropriately.  It's

16   just I needed to know beforehand.

17            ATTORNEY TURNER:  And I meant no disrespect, Your

18   Honor.  I think me and Mr. Matson understood it was coming.

19            ATTORNEY MATSON:  I think we both just realized that

20   somewhere, perhaps even in cross-examination, K-block was going

21   to come up.  So it was something we both knew that the

22   prejudices were there but we'd deal with them.

23            ATTORNEY TURNER:  I apologize to the Court.

24            THE COURT:  Yeah.  No harm, no foul.  It's all right.

25   Where is the -- I just saw it.  All right.  I'm going to

1    scamper back and put all of these changes in, try and get a

2    third draft out to you by the end of the day now so sometime

3    over the weekend you can proof it, you know?

4              ATTORNEY DRESCHER:  Thank you very much.

5              THE COURT:  Yeah, yeah.  Good.  Thank you.

6              ATTORNEY MATSON:  Thank you, Judge.

7

8         (Whereupon at 3:15 p.m. the hearing was adjourned.)

9

10                   C E R T I F I C A T E

11              I, Sunnie Donath, RMR, Official Court Reporter

12   for the United States District Court, District of Vermont, do

13   hereby certify that the foregoing pages are a true and accurate

14   transcription of my stenographic notes of the hearing taken

15   before me in the above-titled matter on May 3, 2024 to the best

16   of my skill and ability.

17

18

19

20

21                         *Sunnie Donath, RMR*

22         --------------------------------

23                         Sunnie Donath, RMR

24

25